776 So.2d 493 (2000)
Danny M. LAMONTE
v.
PREMIER SALES, INC.
Nos. 00-CA-298 and 00-CA-299.
Court of Appeal of Louisiana, Fifth Circuit.
October 18, 2000.
Opinion on Grant of Rehearing January 29, 2001.
Rehearing Denied March 5, 2001.
*494 Robin B. Cheatham, Philip A. Franco, Raymond J. Turcotte, Jr., New Orleans, LA, for Plaintiffs-Appellees.
Joseph R. Martin, Baton Rouge, LA, for Defendant-Appellant.
Panel composed of Judges EDWARD A. DUFRESNE, Jr., JAMES C. GULOTTA, Pro Tem. and H. CHARLES GAUDIN, Pro Tem.
DUFRESNE, Judge.
This is an appeal by Premier Sales, Inc., defendant, from a judgment in favor of Danny Lamonte, plaintiff, in this contract dispute. Lamonte has also appealed parts of the judgment. For the following reasons we set aside those portions of the judgment awarding Lamonte damages for defamation, certain loan expenses, loss on the sale of a crypt, and attorney fees. We also set aside the damage award to Premier for its trade name infringement claim. In all other respect, the judgment is affirmed.
The facts are as follows. Premier Sales, Inc. was in the business of supplying commercial heating, air conditioning and ventilation systems. However, it did not sell the actual commercial air conditioning units. In about 1996 Premier began investigating the possibility of selling such units and contacted several air conditioner manufacturers. It discovered that these manufacturers only dealt through distributors who would handle both residential and commercial units. Rather than attempt to build up a residential business, Premier decided instead to purchase an ongoing residential heating and air conditioning business. It learned that Danny Lamonte, the owner of Heating and Cooling Equipment Sales, Inc., was interested in selling just such a business.
On March 18, 1997, Lamonte sold his 20 year old business to Premier for $225,000, payable in installments of $100,000 at the time of sale, $50,000 on April 1, 1998, $50,000 on April 1, 1999, and $25,000 on April 1, 2000. The sale was for all of the assets of the company, including its name. The agreement also contained a "Covenant Not to Compete & Employment Agreement" clause which provided that Lamonte would not compete with Premier for two years after the sale and, as further consideration, would be employed by it for these same two years. The terms of employment were a $60,000 per year salary, $350 per month car allowance, and commissions. It also stated that "either party may terminate the employment contract for material cause."
Six months later, in September of 1997, Lamonte's employment ended. He asserted that he had been fired for no "material cause" and demanded payment of his salary *495 and benefits for the remaining 18 months of the contract. Premier's position was that Lamonte decided to leave the employment on his own. Lamonte then went back into business for himself as "Lamonte's Heating and Cooling Equipment Sales, L.L.C." Two lawsuits were then filed. In one, Lamonte sued Premier and its president, Joseph Tibodeaux, for his salary and benefits under the contract, as well as for financial losses occasioned by his having to borrow money and sell a funeral crypt at a distressed price to compensate for his lost salary. He also alleged that he had been defamed by Keith May, one of Premier's employees, after he left its employment. Premier urged in the second suit that Lamonte was violating the non-competition clause of the contract by going back into business for himself, and was also infringing on the trade name which it had purchased from him, i.e. "Heating and Cooling Equipment Sales, Inc."
Both suits were consolidated for a nonjury trial. The trial judge ruled that Lamonte indeed had been fired without material cause and awarded him the remaining 18 months of salary and benefits. She also found that he had expended $20,000 in costs to secure loans and had lost $5,000 on sale of the crypt, and awarded him those two amounts, as well as $52,000 in attorney fees. She further found that he had been defamed by a non-party employee of Premier, but not by the defendant Keith May. She nonetheless found Premier liable under the principle of respondeat superior and awarded Lamonte $20,000 for that item. She ruled in Premier's favor on the infringement of trade name claim and enjoined Lamonte from continuing to use the name, as well as awarding Premier $20,000 in damages. However, she found in Lamonte's favor on the non-competition issue, deciding that once Lamonte's employment ended so did the non-competition clause. Both parties have now appealed.
Premier urges first that it was error to find that it breached the employment agreement because the evidence showed that it did not fire Lamonte, but that he instead left voluntarily. Alternatively, it argues that even if Lamonte was fired, it was for a material cause, and likewise that this was not a breach. Second, it asserts that even if it did breach the agreement, there was no finding of bad faith on its part and therefore that the awards of damages for the loan and crypt losses, as well as attorney fees, were not legally supported. Third, it argues that there was no defamation attributable to it, and even if there were the award of $20,000 for this item was excessive. Lamonte urges, to the contrary, that the defamation award should be increased. He also attacks the award of $20,000 for the trade name infringement as unsupported by the evidence. Finally, he asserts that based on evidence presented at trial the judge erred in not finding that Tibodeaux and May had intentionally interfered with his employment contract with Premier.
The main issue here is whether Premier breached the contract of employment. As noted by the trial judge, resolution of this question was a fact intensive inquiry and she made the factual findings that Premier fired Lamonte for no material cause and thus breached the employment contract. On appeal of these findings, the standard of review here is not whether we would have found different facts had we been sitting as the triers of fact, but rather whether the findings made in the trial court are manifestly erroneous or clearly wrong in the context of the entire record of the case, Rosell v. ESCO, 549 So.2d 840 (La.1989).
The generally undisputed evidence showed that Premier's motive in purchasing Lamonte's business was to establish a residential air conditioning sales business in order to get distribution rights to commercial units. At the time of the sale, Lamonte was selling three brands of units and had a warehouse of parts for these three lines. His operation was based on personal contact with contractors and his *496 major promotional techniques involved having frequent coffees at the office and occasional dinners. He did only an in-store business and had no outside salesmen. Premier's president, Joseph Tibodeaux, was aware of the nature of Lamonte's business at the time of the sale.
When Premier took over, Lamonte was made equipment sales manager for its air conditioning operation, a job which Tibodeaux said primarily involved developing and implementing an overall sales strategy. However, one of premier's first decisions was to discontinue all three of Lamonte's brands and attempt to develop a residential unit business with a fourth brand in order to get that manufacturer's commercial line as well. Lamonte convinced Premier to keep at least one of his lines, that of Nordine, but the other two were discontinued and all warehoused parts for these brands were sold at a discount.
Lamonte maintained his normal style of marketing by continuing with his coffees and in-store promotions, and held at least one dinner for customers. Tibodeaux apparently believed that Lamonte should have been developing a new state-wide strategy for boosting business, but it is not clear that he ever explained to Lamonte what steps he thought he should be taking. Tibodeaux testified that he assumed that Lamonte knew what he should have been doing to increase sales because it was Lamonte's expertise that had prompted Premier to buy his business in the first place.
After several months on the job it became clear that Lamonte's efforts had maintained sales about at the same level as before the buy-out, and Tibodeaux was concerned about Lamonte's performance. During this same period, however, Tibodeaux had established that Premier's outside sales force, as well as its in-store sales people, were not to be answerable to Lamonte. By July, Tibodeaux was concerned that Lamonte was not performing as he expected in regard to an overall sales plan, and so Tibodeaux developed one himself. At a July 23, 1997, staff meeting Tibodeaux presented his "blitz" plan and assigned Lamonte the task of calling on numerous customers, architects and engineers, as well as handling plan and specification bids for various jobs.
By that time Lamonte was becoming concerned that he was being forced out of any real managerial position. Then in August Lamonte learned from business contacts at Nordine that they were holding a major dealers meeting in September, but Tibodeaux had not informed Lamonte of this meeting. Lamonte found this peculiar because he had dealt with Nordine for years while no one else at Premier had any idea of their operation. Although Tibodeaux testified that he at first intended to take Lamonte with him to that meeting, he eventually decided to take Keith May instead. When that occurred, Lamonte became more convinced that he was being pushed aside and he asked Tibodeaux if he still had a job. Tibodeaux said the would discuss this after the Nordine meeting.
On September 10, Lamonte met with Tibodeaux and his employment ended on that day. The two men's versions of that meeting differed. Tibodeaux said that they came to a mutual understanding that the employment contract was not working out to the satisfaction of either party and that Lamonte resigned. Lamonte said that he understood that he was being fired without what he considered good cause. He further testified that he demanded his salary for at least a portion of the remaining contract term, but this was refused. He said that he then informed Tibodeaux that he would sue the company for these wages.
On the above evidence, the trial judge found as a matter of fact that Lamonte had not resigned, but rather had been fired. She further found that his firing was without "material cause." In support of this latter finding she noted initially that Lamonte's job duties with Premier had never been defined and that Tibodeaux *497 admitted that he assumed that Lamonte had the expertise to promote sales of residential air conditioning and heating equipment. She pointed out that for the first few months after the sale Lamonte had to reassure his old customer base that Premier would treat them well, handle the dispersal of the warehouse parts for two of his lines which had been discontinued abruptly by Premier, do pricing for bids and specifications on other Premier jobs, as well as try to develop new customers. During this same period Tibodeaux had informed other inside and outside sales people that the were not answerable to Lamonte. Then in July Tibodeaux prepared a sales plan himself and instructed Lamonte to call on over a hundred, and perhaps as many as two hundred, potential customers in a short period of time. Finally, she observed that Lamonte was effectively taken off of the Nordine account when he was not allowed to attend the September meeting of dealers. Her ultimate conclusion was that Tibodeaux had made Lamonte's job impossible to accomplish and had then fired him for not doing so. However, she also dismissed the claims against Tibodeaux personally and declined to find either him or May liable under plaintiffs theory of intentional interference with the employment contract.
In this court's opinion, the findings that Lamonte was fired without material cause are clearly based on a reasonable assessment of the evidence presented, and are thus not manifestly erroneous. We therefore must affirm those findings. Because Premier breached the contract, Lamonte is entitled to his salary and benefits for the remaining 18 months of the agreement. We similarly find no manifest error in the trial judge's conclusion that Tibodeaux and May did not improperly interfere with the contract.
The next issue is whether because of the breach of contract Lamonte is entitled to an additional $20,000 in loan costs and $5,000 for a loss on the sale of a crypt, transactions he contends were made necessary by his loss of salary, and attorney fees. The pertinent sections of La. Civ.Code, Arts.1994-1997, provide generally that when an obligor fails to perform a contract in good faith he is liable only for damages that were foreseeable, while if he fails to perform in bad faith he is liable for all consequent damages. In the present case, the trial judge made no finding that Premier was in bad faith and she dismissed Tibodeaux entirely. Lamonte is therefore not entitled to the allegedly consequential damages of loan costs and the loss on the crypt sale, and we set aside those awards. We also point out that at least in regard to the loan costs, Lamont was awarded legal interest on his lost salary and benefits during the time that Premier held these funds. To award him additional sums for loan costs would in effect be to compensate him twice for the same damages, i.e. the costs of money.
As to attorney fees, under La. Civ.Code., Art.2000 these fees are not compensable unless provided in the contract or by law. This is so even if the obligor is in bad faith in breaching the agreement, Nolan v. Commonwealth National Life Insurance Co. 28,777 (La.App. 2nd Cir. 11/1/96), 688 So.2d 581; writ denied 97-0490 (La.4/18/97), 692 So.2d 449. Here the contract was silent as to attorney fees and no other legal basis for awarding them has been brought to our attention. We therefore set aside the award of attorney fees.
The third issue concerns the award for defamation. The undisputed facts underlying this finding are as follows. Several days after Lamonte was fired Joe Brandstetter, an acquaintance and customer of his who was not employed by Premier, came into Premier's Harvey store with a slip of paper on which he had written "Food Fund for Danny Lamonte." On the counter of the store was a large glass jar into which employees would drop spare change from time to time and when the money accumulated it would be used to buy pizza for lunch. Brandstetter asked *498 Debbie LeBlanc, a Premier employee behind the counter, for a piece of tape to affix the paper to the jar, and she helped him tape it on. Witnesses said variously that the paper was on the jar from one to three days. When Keith May first saw it he immediately told LeBlanc to remove it. Lamonte saw the message once when he came to the store to pick up some mail.
Lamonte named Premier and May as defendants in his defamation action; neither Brandstetter nor LeBlanc were sued. The trial judge exonerated May, but found Premier liable on the implicit grounds that LeBlanc, its employee, was in the course and scope of her employment when she assisted Brandstetter in taping the paper to the jar. While this court has serious reservations about whether the message on the paper constituted an actionable defamation, we need not address that issue further because we find that even if it were, the employer is not liable in the circumstances of this case.
The liability of employers for the tortious acts of their employees is imposed by La. Civ.Code, Art. 2320, which provides pertinently:
Masters and employers are answerable for damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed.
In Benoit v. Capitol Mfg. Co., 617 So.2d 477 (La.1993) the court set out the jurisprudence interpreting this article, which involves consideration of two factors. First, the act must be one arising out of the course employment, and second, it must be within the scope of the employment. The course of employment test refers to time and place, while the scope of the employment test examines the employment related risk of injury. The court concluded its analysis by stating that a strong showing that the act was within the course of employment might be sufficient to compensate for a weak showing that it was within the scope of the employment, and vice versa. In the more recent case of Baumeister v. Plunkett, 95-2270 (La.5/21/96), 673 So.2d 994, a sexual attack occurred during the course of employment. The court nonetheless determined that no employer liability could be imposed because the act was completely beyond the scope of the employment.
In the present case, the alleged defamation had absolutely no relationship to the conduct of the employer's business. LeBlanc was not Lamonte's supervisor nor indeed did she have any work related official or unofficial relationship to him at the time of the incident. Her act in helping tape the note to the jar was not in furtherance of any interest of her employer or its business. In these circumstances, Article 2320 does not render Premier liable for the actions of LeBlanc, and the award against it must therefore be set aside.
For the foregoing reasons, we vacate the awards to Lamonte of the loan related costs, loss on the crypt sale, attorney fees, and damages for defamation. We similarly vacate the award to Premier for trade name infringement. In all other respects the judgment is affirmed.
VACATED IN PART AND AMENDED.

ON APPLICATION FOR REHEARING
PER CURIAM.
The application for rehearing in this matter urged by Danny Lamonte, plaintiff, is granted on the issue of whether he is entitled to an award of attorney fees. In our original opinion we had vacated an attorney fee award of $52,234 made by the trial judge on grounds that there was neither a legal nor a conventional basis for this award. In his original brief plaintiff had brought to our attention La.R.S. 23:632, which mandates such an award in suits for unpaid wages. This is clearly a legal ground for an award of attorney fees, and we were in error in originally setting aside this item. We therefore reinstate *499 the award of attorney fees in the amount fixed by the trial judge.
REHEARING GRANTED.