984 So.2d 72 (2008)
BOARD OF SUPERVISORS OF LOUISIANA STATE UNIVERSITY and Agricultural and Mechanical College
v.
LOUISIANA AGRICULTURAL FINANCE AUTHORITY.
No. 2007 CA 0107.
Court of Appeal of Louisiana, First Circuit.
February 8, 2008.
Rehearing Denied April 3, 2008.
*75 David J. Shelby, Ryan N. Ours, Baton Rouge, LA, for Plaintiff-Appellee, Board of Supervisors of Louisiana State University and Agricultural and Mechanical College.
C. James Gelpi, Clark Richard, New Orleans, LA, for Defendant-Appellant, Louisiana Agricultural Finance Authority.
Before CARTER, C.J., PETTIGREW, and WELCH, JJ.
PETTIGREW, J.
This is an appeal from a grant of summary judgment in a suit alleging the breach of a cooperative endeavor agreement, unjust enrichment, and detrimental reliance. Upon granting plaintiff's motion for summary judgment, the trial court ordered the defendant to pay to the plaintiff a sum owed on an independent contractor's open account for utilities furnished in connection with a public works project, together with attorney fees. From this judgment, the defendant has appealed.

FACTS
On April 30, 1990, the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College ("LSU") entered into a "Cooperative Endeavor Agreement" ("Agreement") with the Louisiana Agricultural Finance Authority ("LAFA") and the Louisiana Department of Agriculture and Forestry ("Department") for the construction and lease of a new Agricultural Chemistry Building (alternately referred to as "Ag-Chem building" or "building") on the Baton Rouge campus of LSU. Although the Agreement established the roles and obligations of the parties both during and after construction of the building, as well as the terms of the lease, the Agreement was not a construction contract.
Pursuant to the terms of the Agreement, the parties agreed that LSU would lease land on its Baton Rouge campus to LAFA for a period of twenty-five (25) years commencing April 30, 1990. In turn, LAFA would provide the funding necessary for the construction, furnishing, and equipping of the Ag-Chem building, and thereafter LAFA would sub-lease the completed building to the Department for the term of the Agreement. It was further specified that LAFA would own the building for the term of the Agreement and that LAFA and LSU would jointly maintain the building. LSU and LAFA's sub-lessee, the Department, would enjoy joint use of the Ag-Chem building during the term of the Agreement and LSU would own the building outright when the Agreement terminated. The Ag-Chem building was intended to house the Department's feed, fertilizer, and pesticide testing laboratories, as well as administrative offices and related support facilities for the benefit of LSU, the Department, and the public of the State of Louisiana.
The Agreement further provided that LAFA would supply "at its sole cost," all labor, services, materials and supplies used in the construction of the Ag-Chem building. For its part, LSU agreed to keep the entire non-structural portions of the Ag-Chem building in good repair and maintenance *76 and further agreed to "pay for all . . . electricity . . . used in or at the Building for any purpose."
Pursuant to the Agreement, and in accordance with the provisions of the Louisiana Public Works Act ("Public Works Act") (La. R.S. 38:2241 et seq.), LAFA solicited bids for the construction of the Ag-Chem building. The bid of Charles Ragusa & Sons, Inc., ("Ragusa") was later accepted as the lowest responsive bidder. On May 1, 1991, LAFA entered into a public works contract and agreed to pay Ragusa a total of $6,344,000.00 for the construction of the Ag-Chem building. The contract together with a surety bond furnished by Ragusa was timely filed with the East Baton Rouge Parish Recorder of Mortgages in accordance with the Public Works Act. Construction of the Ag-Chem building commenced on May 14, 1991. The construction contract specified that Ragusa would achieve substantial completion of the entire work not later than September 4, 1992.
The terms of the construction contract required Ragusa to pay utility charges during the construction of the building. Ragusa chose to purchase utilities required for its construction work from LSU's on-campus generating facility plant. LSU was already furnishing utilities to Ragusa in connection with the construction of another building on LSU's campus. Pursuant to a separate agreement between LSU and Ragusa, LSU agreed to furnish utilities to Ragusa via an open account. LSU thereafter billed Ragusa monthly for the utilities used in both buildings. During construction of the Ag-Chem building, LAFA paid Ragusa the periodic payments specified in the construction contract and out of the funds received from LAFA, Ragusa paid LSU after being invoiced for the utilities it consumed.
As work on the Ag-Chem building progressed, Ragusa repeatedly sought extensions to the construction schedule. In addition, LAFA determined that at least some of Ragusa's work was unsatisfactory. As a result, by early 1993, LAFA became aware that there were insufficient funds to complete the project. In addition, LAFA learned that Ragusa was not paying its subcontractors and suppliers. On February 10, 1993, LAFA notified Ragusa's surety of the mounting problems.
LSU was one of Ragusa's unpaid suppliers. LSU claimed that Ragusa owed it money for utility service furnished to the Ag-Chem building. On November 19, 1993, LSU sent a letter to Ragusa demanding payment for the utilities consumed. LAFA asserted that Ragusa was responsible for payment of the utilities until such time as the Ag-Chem building was substantially complete. Nevertheless, LSU continued to furnish utilities to the building and continued to bill Ragusa.
On April 13, 1994, LAFA notified Ragusa and its surety of Ragusa's default and formal termination of the contract. LAFA cited Ragusa's failure to pay subcontractors and suppliers, including LSU. In a letter to the building's architect, dated June 9, 1994, Ragusa sought compensation for the utility costs that had accumulated on the project since completion of the Ag-Chem building in October 1993; Ragusa claimed acceptance of the project had been beyond its control. The amount requested by Ragusa was $52,733.11 through May 1994. By letter dated June 28, 1994, the building's architect denied Ragusa's request for compensation and asserted that the utilities for the operation of the Ag-Chem building until completion was Ragusa's sole responsibility.
Ragusa filed a formal demand for arbitration against LAFA on June 13, 1994, seeking payment of the remaining balance *77 of contract funds, totaling $444,391.10; utility bills incurred by Ragusa beyond the date LAFA should have accepted the building, totaling $52,733.11; payment of maintenance on HVAC system beyond the date LAFA should have accepted the project, totaling $32,535.00; together with attorney fees and legal interest thereon.
On August 30, 1994, LSU filed a $82,320.99 lien in East Baton Rouge Parish, pursuant to the Public Works Act, wherein LSU alleged nonpayment for utility service it provided to Ragusa in connection with the construction of the Ag-Chem building. LSU also sent a letter to Ragusa's surety, advising of Ragusa's arrearages in connection with the open account and demanding payment from the surety.
On December 14, 1994, LAFA recorded a Notice of Default of Building Contract against Ragusa in the mortgage records of East Baton Rouge Parish with respect to its construction of the Ag-Chem building.
In accordance with the construction contract, the disputes between LAFA and Ragusa were submitted to arbitration. Upon learning of the arbitration, LSU, at the request of LAFA, submitted its claim for utility costs that was included in LAFA's larger claim against Ragusa. LSU did not intervene in the arbitration.
LAFA filed a counterclaim against Ragusa in the arbitration proceedings and alleged that Ragusa's failure to complete the Ag-Chem building resulted in increased expense to complete the project. Additionally, LAFA alleged that Ragusa's failure to substantially complete the project by the agreed completion date entitled LAFA to liquidated damages. LAFA also alleged that Ragusa caused, and thereafter failed to correct, defects in the completed portion of the Ag-Chem building resulting in the expense of replacement or repair of the defects. Finally, LAFA alleged that Ragusa failed to pay subcontractors, material men, and suppliers, resulting in increased expenses for the removal of liens. Prior to the arbitration hearings, LAFA and Ragusa stipulated to the existence and amount of LSU's claim.
After evidentiary hearings, the arbitrators, in February, 1996, awarded LAFA a lump sum of $653,100.00. In the same judgment, the arbitrators awarded Ragusa $297,000.00 against its subcontractor, Hughes Enterprises, Inc., and $17,400.00 against its subcontractor Hamilton Industries. The sums awarded were lump-sum totals, with no indication as to what these amounts represented. A subsequent request by Ragusa for an itemization of the claims and dollar amounts set forth in the arbitration award was denied by the American Arbitration Association on March 4, 1996.
On April 12, 2001, more than five years after LAFA recorded the notice of default, and without the filing of a suit by LSU, LAFA entered into a settlement agreement with Ragusa and Ragusa's surety. The language contained in the settlement agreement expressly excluded a release of any obligations Ragusa may have had with respect to LSU, and further provided that nothing contained therein constituted an admission by Ragusa of any obligation owed to LSU.
LSU continued to press LAFA regarding the amounts owed by Ragusa, although LSU failed to take any action against Ragusa following LAFA's filing of a notice of default. On January 9, 2004, LSU sent a letter to LAFA demanding full payment for the amount set forth in its lien. In its response, LAFA denied any liability for the payment of utilities that LSU furnished to Ragusa.
On June 21, 2004, nearly ten years after LAFA recorded the notice of default *78 against Ragusa, LSU filed the instant suit against LAFA seeking damages and attorney fees for an alleged breach of contract, unjust enrichment, and detrimental reliance. LSU alleged in its petition that "[d]uring construction of the [Ag-Chem] building, LSU provided utilities to LAFA and Ragusa, but was never reimbursed for the cost of said utilities in the sum of $82,320.99." LSU also alleged that unnamed representatives of LAFA had "told" LSU "that sums were withheld from payment to Ragusa in an amount sufficient to cover LSU's claim." Additionally, LSU alleged that "LAFA represented to LSU that once LAFA collected, LSU would be paid for the utilities consumed." Finally, LSU alleged that based upon its information and belief, LAFA was paid $733,000.00 by Ragusa's surety in settlement of LAFA's claims against Ragusa.
In its answer, LAFA denied the allegations made by LSU, but admitted that it had compromised and settled all of its claims against Ragusa and its sureties. LAFA's answer affirmatively asserted that LSU had filed a lien against the Ag-Chem building, and that a copy of LSU's lien had been introduced into the record of the arbitration proceedings between LAFA and Ragusa. LAFA also asserted that pursuant to the terms of the arbitration settlement agreement, LAFA did not receive any funds on LSU's behalf, nor was any portion of the settlement designated as money due LSU. LAFA further asserted that the amount it received in settlement was insufficient to cover all of its losses and damages. Finally, LAFA asserted that the terms of the settlement agreement between LAFA and Ragusa never relieved Ragusa of any obligation owed to LSU, and LSU was always free to pursue any claim it may have had against Ragusa.
By agreement of the parties and with the permission of the district court, the parties filed simultaneous cross motions for summary judgment accompanied by documents that were stipulated by the parties to be authentic and admissible in evidence, together with affidavits of witnesses attesting to facts surrounding the circumstances of the case. Pursuant to mutual agreement, the parties submitted the matter to the trial court for decision with both parties reserving their rights to appeal.

ACTION OF THE TRIAL COURT
On June 19, 2006, a hearing was held before the trial court on the parties' cross motions for summary judgment. Following the argument of counsel, the matter was submitted to the trial court, which denied judgment in favor of LAFA and granted judgment in favor of LSU in the full amount of $82,320.99 together with legal interest, costs, and reasonable attorney fees. Counsel for LSU was directed to submit an affidavit setting forth his time and charges. The trial court later signed a judgment on July 29, 2006, and indicated that attorney fees were "to be determined." The trial court did not issue written reasons for its judgment.
Thereafter LAFA filed a motion to deny attorney fees and also for a new trial. At the conclusion of a hearing held on October 2, 2006, the trial court denied LAFA's motions, and entered judgment fixing the award to LSU of attorney fees at $250.00. LAFA now appeals from the judgments signed by the trial court on July 29, 2006 and October 13, 2006.[1]

*79 ISSUES PRESENTED FOR REVIEW
In connection with its appeal in this matter, LAFA presents the following issues for review and consideration by this court:
1) Whether payment to a contractor in full satisfies an agreement to construct improvements at sole cost;
2) Whether a claimant under the Public Works Act can sue in contract or equity;
3) Whether all contract claims are perempted by the Public Works Act;
4) Whether open account claims prescribe in three years;
5) Whether a Public Works Act claimant can sue for unjust enrichment or detrimental reliance; and
6) Whether a claimant is entitled to attorney's fees not provided by law or contract.

SUMMARY JUDGMENT
In the instant case, the trial court was presented with cross motions for summary judgment. The trial court denied LAFA's motion for summary judgment, but granted LSU's motion for summary judgment, providing only oral reasons. The trial court stated only, "[t]he building was supposed to be constructed at the sole expense, and LSU's motion for summary judgment is hereby granted."
A motion for summary judgment is a procedural device used to avoid a full-scale trial when there is no genuine factual dispute. Sanders v. Ashland Oil, Inc., 96-1751, p. 5 (La.App. 1 Cir. 6/20/97), 696 So.2d 1031, 1034, writ denied, 97-1911 (La.10/31/97), 703 So.2d 29. Summary judgment is properly granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact, and that mover is entitled to judgment as a matter of law. La.Code Civ. P. art. 966(B). Summary judgment is favored and "is designed to secure the just, speedy, and inexpensive determination of every action." La.Code Civ. P. art. 966(A)(2).
The burden of proof on a motion for summary judgment is set forth in La.Code Civ. P. art. 966(C)(2):
The burden of proof remains with the movant. However, if the movant will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the movant's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact.
The initial burden of proof remains with the mover and it is not shifted to the non-moving party until the mover has properly supported the motion and carried the initial burden of proof. Only then must the non-moving party "submit evidence showing the existence of specific facts establishing a genuine issue of material fact." See Scott v. McDaniel, 96-1509, p. 5 (La.App. 1 Cir. 5/9/97), 694 So.2d 1189, *80 1191-1192, writ denied, 97-1551 (La.9/26/97), 701 So.2d 991. If the non-moving party fails to do so, there is no genuine issue of material fact, and summary judgment should be granted. La. Code Civ. P. arts. 966 and 967.
In determining whether summary judgment is appropriate, appellate courts review evidence de novo under the same criteria that govern the trial court's determination of whether summary judgment is appropriate. Sanders, 96-1751 at p. 7, 696 So.2d at 1035. Because it is the applicable substantive law that determines materiality, whether a particular fact in dispute is material can be seen only in fight of the substantive law applicable to the case. Walker v. Phi Beta Sigma Fraternity (RHO Chapter), 96-2345, p. 6 (La. App. 1 Cir. 12/29/97), 706 So.2d 525, 528.

ANALYSIS
Following our de novo review of the record in this matter, we now will proceed to address the issues raised by LAFA in reverse order.
LSU's Entitlement to Attorney Fees
The sixth and final issue presented by LAFA questions whether LSU may recover attorney fees not specifically provided by law or contract. In its Motion for Summary Judgment, LSU prayed for an award of "reasonable attorney fees incurred during the collection of this debt;" and in its supporting memorandum, LSU requested attorney fees based upon "legal bad faith" on the part of LAFA. LSU argues that La. Civ.Code art. 1997[2] provides a basis for an award of attorney fees and sets forth a list of items that it contends evinces bad faith on the part of LAFA.
We note that the Agreement that LSU sued LAFA upon contains no provision for an award of attorney fees. As a general rule, attorney fees are not due and owing a successful litigant unless specifically provided for by contract or by statute. Frank L. Beier Radio, Inc. v. Black Gold Marine, Inc., 449 So.2d 1014, 1015 (La.1984). In its brief to this court, LAFA cites Lamonte v. Premier Sales, Inc., 00-298, 00-299, p. 8 (La.App. 5 Cir. 10/18/00 and 10/19/00), 776 So.2d 493, 497, for the proposition that the forgoing rule applies, "even if the obligor is in bad faith in breaching the agreement."
Without addressing the issue of whether La. Civ.Code art. 1997 is applicable to the facts of this case, we are of the opinion that the "bad faith" referred to in article 1997 generally implies actual or constructive fraud or a refusal to fulfill contractual obligations, not an honest mistake as to actual rights or duties. Delaney v. Whitney National Bank, 96-2144, p. 13 (La.App. 4 Cir. 11/12/97), 703 So.2d 709, 718, writ denied, 98-0123 (La.3/20/98), 715 So.2d 1211.
Based upon a thorough review of the record in this matter, we note that although this case raises very complex factual and legal issues, we find no evidence of bad faith on the part of LAFA. For this reason, the trial court's award of attorney fees in favor of LSU must be reversed.
LSU's Claims for Unjust Enrichment or Detrimental Reliance
The fifth issue presented by LAFA questions whether the facts of this case afford LSU a claim for unjust enrichment or detrimental reliance.
Louisiana Civil Code art. 2298 provides, in pertinent part, for compensation when a person has "been enriched *81 without cause at the expense of another person." The root principle of an unjustified enrichment is that the plaintiff suffers an economic detriment for which he should not be responsible, while the defendant receives an economic benefit for which he has not paid. Scott v. Wesley, 589 So.2d 26, 27 (La.App. 1 Cir.1991). An action for unjust enrichment is allowed only when the plaintiff has no other remedy at law. However where there is a rule of law directed to the issue, an action must not be allowed to defeat the purpose of said rule. Carriere v. Bank of Louisiana, 95-3058, p. 12 (La.12/13/96), 702 So.2d 648, 657. Stated differently, unjust enrichment principles are only applicable to fill a gap in the law where no express remedy is provided. Louisiana National Bank of Baton Rouge v. Belello, 577 So.2d 1099, 1102 (La.App. 1 Cir.1991); see also Coastal Environmental Specialists, Inc. v. Chem-Lig International, Inc., 00-1936, p. 9 (La. App. 1 Cir. 11/9/01), 818 So.2d 12, 19.
In its brief to this court, LAFA argues that it:
was not enriched by Ragusa's failure to pay LSU's invoices for electricity because LAFA paid Ragusa the payments required under the construction contract between LAFA and Ragusa. Ragusa's failure to pay for the electricity may have benefited Ragusa, but it did not benefit LAFA. The amount in damages Ragusa paid LAFA pursuant to the arbitration award was LAFA's funds: LSU was not a party to the proceedings. And because the award was a non-itemized lump sum that was less than one-half of the total LAFA sought in the arbitration, LSU cannot claim Ragusa's payment to LAFA included any of the money owed to LSU by Ragusa for electricity.
LAFA further argues that as a provider of utilities and a claimant pursuant to La. R.S. 38:2242, LSU had a remedy against Ragusa pursuant to the Public Works Act. Having failed to pursue said remedy timely does not permit LSU to now proceed against LAFA for unjust enrichment.
In addition, LAFA asserts that LSU cannot, as a matter of law, establish a claim against it for detrimental reliance because even assuming that LAFA made a verbal promise to ensure the payment of the debt owed by Ragusa, any such promise would have been gratuitous and lacking the required formality of being in writing. See La. Civ.Code art. 1536. Even if LSU relied on an alleged promise by LAFA, such reliance must be considered unreasonable. La. Civ.Code art. 1967.
LSU responds by contending that it did have a claim for unpaid utility charges against Ragusa, and although LSU did not intervene in the arbitration, it cannot be disputed that said claim was included as a component of LAFA's claim for damages against Ragusa. The arbitration panel later awarded LAFA a lump sum settlement to be paid by Ragusa; however, LAFA now denies holding money owed to LSU. LSU further contends that LAFA's failure to pay LSU constitutes an unjust enrichment.
It is the opinion of this court that LSU had other remedies available to it, namely, the Public Works Act, through which LSU could have pursued collection of the monies owed to it by Ragusa. Inasmuch as LSU failed to pursue the remedies available to it pursuant to the Public Works Act, LSU may not now seek recovery against LAFA based upon a theory of unjust enrichment. This does not necessarily imply that LSU is precluded from recovery pursuant to the terms of the Agreement between it and LAFA, and we will address this issue later in this opinion.
*82 Alleged Breach by LAFA of Agreement with LSU and Prescription of LSU's Open Account Claims
We will now address the first and fourth issues presented by LAFA, namely, whether LAFA's payment in full to its contractor Ragusa satisfied its obligation under the Agreement to construct the Ag-Chem building at its sole cost, and also whether claims based upon an open account are subject to a three-year prescriptive period.
LAFA asserts that the Agreement contemplated the construction of a public building; and it was agreed by the parties thereto  LAFA, LSU, and the Department  that LAFA would engage an independent building contractor pursuant to a public works contract to carry out the obligations assumed by LAFA under the terms of the Agreement. In furtherance thereof, LAFA entered into a public works contract with Ragusa for the construction of the Ag-Chem building and made periodic payments to Ragusa, as specified in the contract. Ragusa thereafter contracted to purchase utilities from LSU on open account.
LAFA insists that it was not a party to any agreement between LSU and Ragusa. LAFA points out that the three contracts at issue in this dispute  the Agreement between LAFA, LSU, and the Department; the construction contract between LAFA and Ragusa; and the open account between Ragusa and LSU  were three distinct transactions. Accordingly, the rights and obligations of the parties pursuant to one contract could not be enforced through another contract. Therefore LSU could not sue LAFA to collect Ragusa's open account debt; LSU could not sue to compel LAFA to pay Ragusa pursuant to the construction contract; and LAFA could not sue to compel Ragusa to pay LSU pursuant to the open account.
LAFA cites La. Civ.Code art. 3494(4) for the proposition that actions on open account are subject to a liberative prescription of three years. Inasmuch as LSU failed to bring an action against Ragusa within three years, LAFA argues that LSU's claim against Ragusa has prescribed. LAFA also argues that even if LSU could have established a promise by LAFA pursuant to the Agreement to be responsible for the bill incurred by Ragusa, LAFA would have been nothing more than a surety. LAFA further cites La. Civ.Code art. 3060 for the proposition that prescription of a principal obligation extinguishes the obligation of a surety.
By way of response, LSU contends that merely because LSU may have a separate cause of action against Ragusa for the same debt pursuant to an alternate legal theory, LAFA was not relieved of its obligation, pursuant to Section 2.5 of the Agreement, to provide services used in the construction of the building. LSU claims that the utilities it provided to Ragusa was one such service. LSU further claims that it does not allege that LAFA is the surety of Ragusa, only that LAFA is primarily obligated to LSU pursuant to the terms of the Agreement.
There is no question that LAFA, LSU, and the Department were parties to the Agreement that bound LAFA to engage an independent building contractor pursuant to a public works contract for the purpose of performing the obligations assumed by LAFA in connection with the Agreement. In defining the obligations of the respective parties, we must attempt to ascertain the common intent of the parties to the Agreement. La. Civ.Code art. 2045. Pursuant to the language set forth in paragraph 2.5 of the Agreement, LAFA assumed the following obligations:

*83 2.5 Construction of Improvements: At its sole cost and expense, LAFA shall (1) construct in a good and workmanship manner Improvements on the Premises, in accordance with plans and specifications approved by the University and LAFA; (2) procure all necessary permits and governmental approvals for the erection of the Improvements; (3) provide for labor, services, materials and supplies used or furnished in construction of the Improvements and the construction and installation of utility services or other facilities; (4) supervise and control all aspects of the construction, furnishing and equipping of the Building; . . .
In conjunction therewith, we must also examine paragraphs 2.10 and 4.4 of the Agreement that provide:
2.10 Utilities, Sewerage and Telephones: At its expense, LAFA shall install, or cause to be installed, public utilities, including gas, electricity, water, chilled water, heating water, sewerage and telephones, to the site of the Premises and to the Building constructed thereon and individually meter the Building for these utility services. All installation routes for utility services must be approved by the University prior to installation. Upon occupancy of the Building, the University shall be responsible for the payment of all utility charges, in accordance with Section 4.4 hereof.
4.4 Utility Charges: University shall pay for all water fees, sewage, fuels, electricity, steam and gas used in or at the Building for any purpose.
As LAFA notes in its brief, the foregoing language of the Agreement is clear: LAFA agreed to pay for the cost of constructing the building; LSU agreed to pay for all utilities for any purpose and, at the very least, for all utilities consumed in connection with the maintenance and use of the building following its occupancy.
There was no evidence introduced by any of the parties to this action with respect to when LSU commenced its occupancy of all or part of the Ag-Chem building. Accordingly, the trial court was unable to make a determination as to when LSU commenced its occupancy of all or part of the Ag-Chem building. This material issue of fact is determinative of whether LAFA or LSU is liable for the utility charges at issue pursuant to the terms of the Agreement. Since there is no factual basis to make that determination from the record, a material issue of fact remains in dispute thereby precluding summary judgment. It was therefore improper for the trial court to have rendered summary judgment in favor of LSU.
Applicability of the Louisiana Public Works Act and Peremption of LSU's Claims
The final two issues presented by LAFA concern the applicability of the Public Works Act and whether the Public Works Act perempts LSU's claim.
LAFA asserts that by every definition, LSU's claim fails within the purview of the Public Works Act, and further points out that LSU even recorded a lien pursuant thereto. LAFA argues that in order to preserve its claim, LSU was required to follow the procedure set forth in the Public Works Act. Pursuant to La. R.S. 38:2247, a claimant must file suit against the surety or the contractor or both within one year from the registry of acceptance of the work or of notice of the contractor's default. In the event other claimants exist, all claims shall be tried through a concursus proceeding pursuant to La. R.S. 38:2243(B). It is undisputed that LSU failed to institute any action pursuant to the Public Works Act.
*84 As LSU failed to bring a claim against Ragusa or its surety within one year from the date LAFA recorded the notice of default, LAFA argues that LSU's claim has been extinguished. LAFA further asserts that LSU now attempts to circumvent the time limitations of the Public Works Act by seeking payment from LAFA under the equitable principles of unjust enrichment and detrimental reliance.
In responding to the assertions of LAFA, LSU contends that LAFA's reliance on the Public Works Act is misplaced and inapplicable as the Agreement between LAFA, LSU, and the Department was not a contract for the actual construction of a public building. LSU concedes that although the construction contract between LAFA and Ragusa was a public contract/work pursuant to the Public Works Act, LSU was not a party to said contract. LSU further contends that its claim against LAFA and the trial court's grant of summary judgment were based upon the Agreement between LAFA, LSU, and the Department.
LSU takes the position that pursuant to the terms of the Agreement, it has "an alternative, and indeed preferred, means of [obtaining] reimbursement . . . of all costs associated with construction." Contending that the Agreement constitutes the law as between the parties, LSU claims it is entitled to judgment as a matter of law together with reimbursement of the outstanding utility charges.
It is evident to this court that the legal dispute in this case is LSU's unpaid invoices for utilities that it provided to the general contractor Ragusa in connection with Ragusa's construction of the Ag-Chem building. In accordance with paragraph 2.10 of the Agreement, LAFA tendered payment to Ragusa until such time as Ragusa defaulted. The utility invoices submitted by LSU appeared to be for the period of time leading up to and after Ragusa's default.
There is no question that the public works contract between LAFA and Ragusa for the construction of the Ag-Chem building is a separate and distinct contractual arrangement from the Agreement between LAFA, LSU, and Department. The Agreement between LAFA, LSU, and Department contains no provision mandating that LSU must provide electricity to the building's contractor. In choosing to provide electricity to Ragusa on open account, LSU voluntarily elected to become a subcontractor or provider of services (i.e., utilities) to Ragusa, which was the general contractor with respect to the construction of the Ag-Chem building. The Cooperative Endeavor Agreement between LAFA, LSU, and the Department did not make LAFA a surety or guarantor of Ragusa's separate debt to LSU.
The contract between LAFA and Ragusa was a "Public Contract," defined by La. R.S. 38:2211(10) as: "[a]ny contract awarded by any public entity for the making of any public works or for the purchase of any materials or supplies." LSU was a "claimant" under a Public Works Contract, defined by La. R.S. 38:2242(A) as: "[a]ny person to whom money is due pursuant to a contract with a contractor or subcontractor for . . . furnishing . . . electricity, or other materials or supplies for use of machines used in the construction, alteration, or repair of any public works." The Public Works Act is sui generis and provides the exclusive remedy for claims made in connection with the construction of public buildings. See State, Division of Administration v. McInnis Brothers Construction, 97-0742 p. 9 (La.10/21/97), 701 So.2d 937, 944. The exclusivity of the Public Works Act applies equally to contractors and to public bodies. Orleans Parish *85 School Board v. Scheyd, Inc., 98-2989 p. 6 (La.App. 4 Cir. 6/16/99), 737 So.2d 954, 958, writ denied, 99-2103 (La.11/5/99), 750 So.2d 181.
To collect from Ragusa and its surety, LSU was required to follow the procedures set out in the Public Works Act. Pursuant to La. R.S. 38:2247, a claimant, in order to preserve its rights, must file suit against the contractor, the surety, or both within one year from date of notice of default of the contractor (or of recording acceptance of the work). LSU did record its lien, but it never proceeded forward to have its lien recognized. It is well settled that time limits contained in the Public Works Act are peremptive, in that the Public Works Act both creates the right of action and stipulates the time within which the right may be executed. See McInnis, 97-0742 at p. 4; 701 So.2d at 941.
LSU voluntarily chose to provide utilities to Ragusa, and by doing so, was limited in the time period within which to assert its claim for said unpaid invoices. Thus, in order to preserve its rights under the Public Works Act, LSU was required to bring an action against Ragusa or Ragusa's surety within one year of December 14, 1994, the date LAFA recorded the notice of default. This LSU failed to do. Accordingly, LSU has lost its cause of action for those unpaid utility bills. LSU's exclusive remedy for those unpaid utility bills was pursuant to the Public Works Act. Therefore, the trial court's judgment in favor of LSU was in error, and the trial court should have granted LAFA's cross motion for summary judgment. The trial court's judgment must be reversed.

CONCLUSION
For the above and foregoing reasons, the trial court's grant of LSU's motion for summary judgment and denial of LAFA's cross motion for summary judgment, together with its award of damages and attorney fees in favor of LSU, are hereby reversed. LAFA's cross motion for summary judgment is hereby granted, and LSU's case is accordingly dismissed at its costs. All costs associated with this appeal totaling $1,700.64 shall be assessed against LSU, petitioner-appellee.
REVERSED AND RENDERED.
CARTER J., concurs.
WELCH J., concurs without reasons.
NOTES
[1] On April 18, 2007, pursuant to docket number 2007-CW-0213, this court granted LAFA an appeal from the trial court's judgment denying its motion for summary judgment while granting LSU's cross motion for summary judgment. A review of the trial court's denial of LAFA's cross motion for summary judgment is appropriate because the issues involved are identical to those presented by the grant of LSU's motion for summary judgment. This court has recently allowed such review of opposing motions. See Hood v. Cotter, 06-1390, p. 2 (La.App. 1 Cir. 12/28/07), 978 So.2d 988, 990; Dean v. Griffin Crane & Steel, Inc., 05-1226 (La.App. 1 Cir. 5/5/06), 935 So.2d 186, 189 n. 3, writ denied, 06-1334 (La.9/22/06), 937 So.2d 387.
[2] Louisiana Civil Code art. 1997 states that "[a]n obligor in bad faith is liable for all the damages, foreseeable or not, that are a direct consequence of his failure to perform."