HUGHES, J.
12This is an appeal from a district court’s summary judgment dismissing an action for contractual commissions allegedly owed on the placement of video poker devices at a truck stop. For the reasons that follow, we reverse and remand.
FACTS AND PROCEDURAL HISTORY
In October of 1993, Gil Lerma, who would later become one of the shareholders of BLPR, Inc. (“BLPR”), entered into an “Independent Associate Contract” with Louisiana Gaming Management, Inc. *781 (“Louisiana Gaming”), the company assets of which would later be acquired by National Gaming, Inc. (“National Gaming”). Mr. Lerma’s contract provided to him a ten percent commission on net revenue received by Louisiana Gaming on each video draw poker device placed in a licensed establishment through his efforts. Mr. Lerma was successful in placing Louisiana Gaming’s video draw poker devices at a Quality Inn Truck Stop (now known as the Econo Lodge Lucky Bayou Truck Stop (“ELLB Truck Stop”)), located in Chal-mette, Louisiana, in March of 1994. The ELLB Truck Stop contract, dated March 18, 1994, was for an initial ten year term, with optional additional five year renewal periods.[1]
hAlso, in March of 1994, Mr. Lerma formed the BLPR corporation, with himself, Richard L. Barrios, Jr.,[2] Guy *782 Palermo, and Richard E. Redd[3] as shareholders. The stated purpose of the corporation was to promote the business of and obtain contracts for Louisiana Gaming for the operation of video poker establishments. At the same time, Mr. Lerma executed an 14assignment of rights in favor of BLPR of “any revenues owed to him as a consequence of any agreement by him to act as an associate or master associate or in any capacity with [Louisiana Gaming].” Payments were satisfactorily made to BLPR by Louisiana Gaming under the contract, although the parties later agreed that only a five percent commission would be paid due to the financial difficulties of Louisiana Gaming. Subsequently, in approximately May of 2000, Louisiana Gaming filed for bankruptcy protection in the Bankruptcy Court for the Eastern District of Louisiana (Case Number 99-15405), and the ELLB Truck Stop contract was acquired in that proceeding, along with other assets, by National Gaming. Thereafter, in August of 2000, National Gaming ceased paying commissions to BLPR, ostensibly because it determined that in order to be entitled to collect the commission on the ELLB Truck Stop contract, BLPR was required to meet the suitability requirements of LSA-R.S. 27:S10(D), which requires certain persons, in addition to license holders, to establish to the satisfaction of the “division”[4] that they are “suitable” *783 to be allowed to participate in the video draw poker gaming industry. These persons include, in summary: persons controlling more than a five percent ownership, income, or profit interest in an entity which has or applies for a license; persons who receive more than five percent revenue interest in the form of a commission, finder’s fee, loan prepayment, or any other business expense related to the gaming operation; or persons who have the ability to exercise a significant influence over the activities of a licensee.
No further commission payments were made to BLPR, which filed the instant suit on January 27, 2004, against National Gaming, seeking to recover the commission payments allegedly owed, along with other economic damages sustained. National Gaming asserted numerous defenses to the action, and subsequently filed a motion for summary judgment, contending that BLPR was ineligible to receive the monies it requested because “(a) it has failed to meet the gaming suitability requirements of [LSA-] R.S. 27:310; , and (b) some of its principals, and/or others required by law, have failed to apply for or meet gaming suitability requirements as required by [LSA-] R.S. 27:310, by order of the Bankruptcy Court[,] and by the [Louisiana] Gaming Control Board” (“LGCB”).
Following a hearing on the motion for summary judgment, the district court rendered judgment in favor of National Gaming, granting the motion and dismissing BLPR’s action. In its oral reasons for judgment, the district court stated that “the Court ... is firmly of the opinion that if five percent is met, they’re obligated to meet suitability requirements in accordance with statutory interpretation inasmuch as gaming is a business that is effective [sic] with the public good. It’s got to be strictly controlled.” This appeal followed.
On appeal, BLPR asserts that the trial court erred in granting summary judgment in favor of National Gaming, as material facts remain in dispute. BLPR further assigns as error the consideration by the district court of evidence submitted relative to the administrative suitability investigation conducted by the Video Gaming Division of the Office of State Police |fi(“VGD/OSP”) as to BLPR, contending that such a reconsideration of those issues by the district court was violative of the separation of powers doctrine, as well as exceeded the district court’s original subject matter jurisdiction (asserting that review of the administrative findings would constitute an exercise of appellate jurisdiction).
LAW AND ANALYSIS

Motion for Summary Judgment

The summary judgment procedure is designed to secure the just, speedy, and inexpensive determination of every action, except those disallowed by LSA-C.C.P. art. 969; the procedure is favored and shall be construed to accomplish these ends. LSA-C.C.P. art. 966(A)(2). Summary judgment shall be rendered in favor of the mover if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact and that mover is entitled to judgment as a matter of law. LSA-C.C.P. art. 966(B).
Appellate courts review summary judgments de novo under the same criteria that govern a district court’s consideration of whether summary judgment is appropriate. Samaha v. Rau, 2007-1726, pp. 3-4 (La.2/26/08), 977 So.2d 880, 882; Allen v. State ex rel. Ernest N. Morial-New Or *784 leans Exhibition Hall Authority, 2002-1072, p. 5 (La.4/9/03), 842 So.2d 373, 377; Boudreaux v. Vankerkhove, 2007-2555, p. 5 (La.App. 1 Cir. 8/11/08), 993 So.2d 725, 729-30.
In ruling on a motion for summary judgment, the judge’s role is not to evaluate the weight of the evidence or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. All 17doubts should be resolved in the non-moving party’s favor. Hines v. Garrett, 2004-0806, p. 1 (La.6/25/04), 876 So.2d 764, 765.
A fact is material if it potentially insures or precludes recovery, affects a litigant’s ultimate success, or determines the outcome of the legal dispute. A genuine issue is one as to which reasonable persons could disagree; if reasonable persons could reach only one conclusion, there is no need for trial on that issue and summary judgment is appropriate. Id., 2004-0806 at p. 1, 876 So.2d at 765-66.
On motion for summary judgment, the burden of proof remains with the movant. However, if the moving party will not bear the burden of proof on the issue at trial and points out that there is an absence of factual support for one or more elements essential to the adverse party’s claim, action, or defense, then the non-moving party must produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial. If the opponent of the motion fails to do so, there is no genuine issue of material fact and summary judgment will be granted. See LSA-C.C.P. art. 966(C)(2).
When a motion for summary judgment is made and supported as provided in LSA-C.C.P. art. 967, an adverse party may not rest on the mere allegations or denials of his pleadings, but his response, by affidavits or as otherwise provided in LSA-C.C.P. art. 967, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be rendered against him. LSA-C.C.P. art. 967(B). See also Board of Supervisors of Louisiana State University v. Louisiana Agricultural Finance Authority, 2007-0107, p. 9 (La.App. 1 Cir. 2/8/08), 984 So.2d 72, 79-80; Cressionnie v. Intrepid, Inc., 2003-1714, p. 3 (La.App. 1 Cir. 5/14/04), 879 So.2d 736, 738.
[^Because it is the applicable substantive law that determines materiality, whether a particular fact in dispute is material can be seen only in light of the substantive law applicable to the case. Richard v. Hall, 2003-1488, p. 5 (La.4/23/04), 874 So.2d 131, 137; Dyess v. American National Property and Casualty Company, 2003-1971, p. 4 (La.App. 1 Cir. 6/25/04), 886 So.2d 448, 451, writ denied, 2004-1858 (La.10/29/04), 885 So.2d 592; Cressionnie v. Intrepid, Inc., 2003-1714 at p. 3, 879 So.2d at 738-39.

Video Draw Poker Devices Control Law

The applicable law in this case is provided by the Louisiana Gaming Control Law, LSA-R.S. 27:1, et seq., and the Video Draw Poker Devices Control Law, LSA-R.S. 27:301, et seq. Louisiana Revised Statute 27:309(B)[5] makes it a crime for *785 any person[6] to operate a video draw poker device without the license required by LSA-R.S. 27:301, et seq. The primary licensing requirements for a video draw poker device owner, operator, or distributor are set forth in LSA-R.S. 27:306 and LSA-R.S. 27:310 et seq.
In this case, National Gaming was required to be licensed as the owner, operator, or distributor of the video poker devices located at the ELLB Truck Stop. As stated in the case cited to this court by National Gaming, Gaming Venture, Inc. v. Tastee Restaurant Corporation, 2008-310 (La.App. 5 Cir. 9/30/08), 996 So.2d 515, writ denied, 2008-2590 (La. |g1/9/09), 998 So.2d 723, licensing, along with the accompanying requisite contract and suitability reviews by the VGD/OSP, are prerequisites to beginning the operation of video poker machines, pursuant to LSA-R.S. 27:306 and La. Admin. Code, Title 42, Part XI, § 2411. See Gaming Venture, Inc. v. Tastee Restaurant Corporation, 2008-310 at p. 4, 996 So.2d at 517.[7] Further, LSA-R.S. 27:306(A)(7)(a) specifically states, in pertinent part, that “[a]ny person applying for a truck stop facility license must meet all requirements provided by this Chapter prior to licensing.” Louisiana Revised Statute 27:311(E) also provides that “[n]o license shall be issued by the division except upon receipt of a sworn application and a finding by the division that the applicant, the application, and all persons described in R.S. 27:310 meet the requirements of that Section.” Even though it *786 was not asserted in this case that BLPR was required to obtain a license, other gaming participants may be required to submit to a suitability review, in accordance with LSA-R.S. 27:310(D), and, if so required, “shall |inmeet all suitability requirements and qualifications for licensees,” as stated therein.
In its motion for summary judgment, National Gaming asserted that BLPR was required to submit to an administrative suitability review, pursuant to: LSA-R.S. 27:310(D), administrative regulations, and the Bankruptcy Court’s order. We will review each of these asserted authorities. LSA-R.S. 27:310(D)
In addition to licensees,[8] Louisiana law has required since July 1, 1994 that “[e]very person ... who receives more than five percent revenue interest in the form of a commission ... related to the gaming operation ... shall meet all suitability requirements and qualifications for licensees.”[9] See LSA-R.S. 27:310(D) and its precursor, former LSA-R.S. 33:4862.10(D) (as amended by 1994 La. Acts, 3d Ex. Sess., No. 13, § 1, effective July 1, 1994) (emphasis added). National Gaming contends that BLPR was required to meet suitability requirements on the basis of this provision.
However, in the instant case, it was not established that BLPR was receiving more than a five percent revenue interest in the ELLB Truck Stop contract. Although BLPR’s original contract with Louisiana Gaming | n provided for a ten percent commission, BLPR had verbally agreed with Louisiana Gaming to take only a five percent commission. The date on which this agreement was made was not conclusively established in the record, though it was before Louisiana Gaming went bankrupt. The parties do not appear to dispute that National Gaming was also paying only a five percent commission to BLPR before the payment of commissions was discontinued in August of 2000. Thus, the record presented on appeal does not establish that BLPR was receiving more than five percent, in order to trigger the LSA-R.S. 27:310(D) mandate[10] for a suitability de *787 termination as to BLPR.[11]

Administrative Requirements

National Gaming further contends that a suitability determination was required to be made as to BLPR under the authority of La. Admin. Code, Title 42, Part XI, § 2411(H)(3), stating: “If requested, every person who is party to any video gaming contract with an applicant for a video gaming license, or a licensee of the division, shall provide the division with any and 11?all information requested by the division that is necessary for a determination of suitability.” (Emphasis added.) A March 27, 1997 letter from the chairman of the LGCB, directed to renewal applicants, also declared that included within the persons required to submit to a suitability determination was “anyone who receives a percentage of the gaming revenue and their spouses.” (Emphasis added.) Further, a copy of the LGCB application instructions was filed into the record and states that the term “person required to meet suitability” includes “any person who receives or may receive a percentage of the gaming revenue from the applicant; ... [a]lso spouses of any person who receives or may receive a percentage of the gaming revenue from the applicant.”[12] (Emphasis added.) In conjunction with its motion for summary judgment, National Gaming filed into the record a copy of an August 8, 2000 letter from Trooper Kirk A. Pierce of the VGD/OSP, requesting, in connection with National Gaming’s purchase of the Louisiana Gaming assets, suitability applications from National Gaming’s associates “receiving video poker revenue,” and specifically naming, in addition to others, BLPR. National Gaming asserts that “BLPR was never found suitable by the [LGCB].”[13] (Underscoring original.)
*788 Our review of the record reveals a question of fact as to whether BLPR was, in fact, found suitable by the VGD/OSP. BLPR filed its application for suitability on December 13, 2001. Excerpts from the | ^deposition and written report of Trooper Pierce, the investigating agent for the VGD/OSP, were filed into the record. Following his investigation and the settlement agreement between BLPR and the Redd parties, Trooper Pierce stated that, pursuant to the law and regulations governing video draw poker (specifically LSA-R.S. 27:310), he “found nothing to preclude anyone associated with BLPR to receive commission,” though he could not say whether a letter to that effect, as to BLPR, had been issued.[14] Trooper Pierce also indicated that the investigation concerning BLPR was unique, in that BLPR was not applying for a license; he stated that licensees always receive written notification of the results of an investigation. Trooper Pierce further indicated that, because BLPR was not seeking a license and its case only involved third party revenue (i.e., commissions), he was not sure whether the investigation results had been issued in writing. Trooper Pierce also stated that he had never encountered this type situation before. However, Trooper Pierce related that the Attorney General’s office became involved in reviewing the BLPR documents and ascertaining whether the April 17, 2003 settlement agreement reached between BLPR and the Redd parties (whereby the Redd parties divested themselves of any interests/rights in BLPR), would result in BLPR meeting suitability requirements. Trooper Pierce stated that when a corporation under review has a shareholder who presents suitability issues, the corporation is given the opportunity to rectify the situation. Trooper Pierce further stated that it is sometimes possible for a corporation to remove the party with questionable suitability (i.e., by purchasing stock, | uchanging officers, etc.), and after approval by the Attorney General’s office, an investigation may be satisfactorily finalized in that way. Trooper Pierce indicated that this was the procedure utilized in the BLPR case. The deposition testimony of Trooper Pierce and accompanying documentation, taken as a whole, indicates that BLPR was found suitable. No evidence was presented to the contrary.
Moreover, we find no merit in the assertion that the cited administrative rules, regulations, and or actions validly require a suitability review as to BLPR, because such a requirement would exceed the legislatively-established parameters for suitability. The regulations promulgated by an agency may not exceed the authorization delegated by the Legislature. State v. Alfonso, 99-1546, pp. 8-9 (La.11/23/99), *789 753 So.2d 156, 162; Farmer’s Seafood Company v. State Through the Department of Public Safety, 2010-1746, p. 14 (La.App. 1 Cir. 2/14/11), 56 So.3d 1263, 1272; Piazza’s Seafood World, LLC v. Odom, 2007-2191, p. 12 (La.App. 1 Cir. 12/28/08), 6 So.3d 820, 828. See also LSA-R.S. 49:963.[15] An agency exercising delegated authority is not free to pursue any and all ends, but can assert authority only over those ends that are connected with the task delegated by the legislative body. The open-ended discretion to choose ends is the essence of legislative power; it is this power that the legislative body possesses, but its agents lack. State v. Alfonso, 99-1546 at p. 9, 753 So.2d at 162.
With respect to this case, we conclude that although the legislature has delegated the power of investigation, as well as other powers, to the LGCB 11sand the VGD/OSP (including authority to promulgate rules and regulations in furtherance of that power), pursuant to LSA-R.S. 27:15, 27:20, 27:24, 27:308, and 27:313, neither the LGCB nor the VGD/OSP should be allowed to enlarge the scope of this investigatory power to instances not statutorily authorized. To the extent the cited administrative rules and/or regulations and other administrative actions seek to legislate, prescribe, or expand those instances in which a non-licensee is required to meet suitability, in addition to those set forth by the legislature in LSA-R.S. 27:310(D), we conclude that these administrative directives do not create any suitability requirement beyond that contained in LSA-R.S. 27:310.

Bankruptcy Court Order

National Gaming asserts in brief to this court that the Bankruptcy Court “specifically ordered associates of [Louisiana Gaming] and anyone receiving commissions from gaming revenues to apply to meet suitability.” We disagree.
The order of the Bankruptcy Court for the Eastern District of Louisiana stated, in pertinent part, as follows:
Pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts between Debtor [Louisiana Gaming Management, Inc.] and any person or enti[t]y shall be assumed by the Debtor under this Plan and assigned to the Purchase[r],[16] except: (1) Associate Contracts between the Debtor and persons or entities determined to be unsuitable by the LGCB; ....
* * *
The Associate Contracts shall be assumed in accordance with the Plan and the May 25, 2000 National Gaming offer in that the commission paid on the assumed Associate Contracts shall be the lesser of the contract rate or twenty [percent] (20%) of the net gaming revenue (as that term is defined in the associate contracts).
h fiFinally, all location agreements of the Debtor, including those specifically listed on Exhibit “B” to the Plan are expressly assumed and assigned to Purchaser and Purchaser shall have all of the Debtor’s rights, title, and interest under those contracts.
*790 (Emphasis added.) National Gaming asserts that the phrase in this order stating, “except ... Associate Contracts between the Debtor and persons or entities determined to be unsuitable by the LGCB” constitutes an affirmative directive to all persons or entities having associate contracts with Louisiana Gaming, being transferred to National Gaming, to apply for and obtain a declaration of suitability. On the contrary, the language at issue was obviously meant to declare only that if, in the normal course of its business and pursuant to the application of Louisiana law, the LGCB determined any of the referenced persons or entities to be “unsuitable,” the contracts of those persons/entities were not required to be assumed by National Gaming. We find no merit in National Gaming’s argument on this issue.
Having rejected all of National Gaming’s asserted bases for contending BLPR was required to obtain a favorable suitability determination, but failed to do so, we conclude National Gaming was not entitled to summary judgment in its favor. Having decided the appeal on these grounds, we find it unnecessary to address the remaining assignments of error asserted by BLPR.
CONCLUSION
For the reasons assigned herein, the judgment of the district court, rendering summary judgment in favor of National Gaming, Inc. and dismissing the claims of BLPR, Inc., is hereby reversed, and the matter is remanded for further proceedings in accordance with the foregoing. All costs of this appeal are to be borne by National Gaming, Inc.
REVERSED AND REMANDED.

. The ELLB Truck Stop contract terminated effective March 18, 2004, pursuant to the December 2, 2003 notice of termination forwarded by the truck stop to National Gaming.

. Mr. Barrios died on December 9, 1994, owning a one-quarter interest in BLPR. A certified copy of the judgment of possession rendered in his succession proceeding was filed into the district court record. However, it is not clear which of the listed assets represented Mr. Barrios’s BLPR stock. Several assets were listed that referenced corporate stock (“2500 Shares of Blipper, Inc.,” "1000 shares Barrios Investments, Inc.,” "1000 shares of Old World Casinos, Inc.,” and "1000 Shares of Stock One Source, Inc.") and one asset was named as "Glenn's Video Poker Contract,” but none were denominated “BLPR.” Some of these assets were community property and some were separate property. The judgment of possession indicated that Mr. Barrios’s will left his wife, Patricia Vos-burg Barrios, undivided one-half interests in both his community and separate property, and the other one-half interests in Mr. Barrios’s community and separate property were left to his children, Lisa Barrios Jordan, Roxanne Barrios, Pamela Barrios Cuculla, and Stacie Barrios Nola. Thus, if the BLPR stock was community property, Mrs. Barrios owned a one-half share of the one-quarter interest in BLPR (a one-eighth interest in BLPR), and inherited one-half of Mr. Barrios’s one-eighth share in BLPR (a one-sixteenth interest in BLPR), which would have given Mrs. Barrios a total three-sixteenth interest in BLPR (in other words, an 18.75% interest). Under this community property scenario, Mr. Barrios’s four children would have shared equally in the other one-half interest in Mr. Barrios’s one-eighth interest in BLPR, which would have given them, individually, a one-quarter share of a one-sixteenth share (in other words, an undivided one-sixty-fourth interest, which is a 1.5625% interest, each, in BLPR). If the BLPR stock was Mr. Barrios’s separate property, then Mrs. Barrios would have inherited one-half of that one-quarter interest in BLPR (a one-eighth interest, which is a 12.5% interest in BLPR), and the children would have inherited quarter shares each in the other half of Mr. Barrios’s one-quarter interest in BLPR (in other words, a one-thirty-second interest, each, which is a 3.125% interest in BLPR). In brief to the district court, counsel for BLPR stated that Mrs. Barrios inherited a 12.5% interest and that the children inherited a 3.125% interest in BLPR, indicating the separate property scenario was correct. However, none of the separate property assets named in the judgment of possession ("Glenn’s Video Poker Contract” (the instant video poker contract originally belonged to Gilbert "Gil” Lerma), "1000 shares of Old World Casinos, Inc.,” or ”1000 Shares of Stock One Source, Inc.”) have any relevant or apparent connection to the BLPR stock, while one of the community assets listed has a greater appearance of being the BLPR stock, "2500 Shares of Blipper, Inc.,” for the following reasons. It was indicated in the corporate deposition of BLPR, given by Guy Palermo, that, originally, 10,000 shares of stock were authorized for BLPR and that each of the four stockholders were to receive 2,500 shares each, though no stock certificates were actually issued. Further, BLPR's Articles of Incorporation, a copy of which was filed into the district court record, recite: “The aggregate number of shares the corporation shall have authority to issue is 10,000. Each of the four incorporators will receive 2,500 shares.” Mr. Palermo also indicated in his deposition that there was a nickname for the company. When Palermo referred to the company, he called it "BLPR” (as recorded in the transcript), and the examining counsel asked, *782 "Just for the record, when you refer to BLPR — ,” to which Mr. Palermo responded, "I’m sorry, BLPR. It’s a nickname." Although it is not further explained by the partial deposition excerpt appearing in the record on appeal, it appears that Mr. Palermo may have pronounced "BLPR” phonetically, which would sound like "Blipper." So, the 2,500 shares of stock Mr. Barrios owned in BLPR may have been listed in the succession judgment of possession as "2500 Shares of Blipper, Inc.” We further note that, on April 17, 2003, in a settlement agreement between the BLPR shareholders, it was stated: "Richard L. Barrios, Jr., died on December 9, 1994 and Darlene C. Redd represents that she subsequently acquired a one eight [sic] (1/8) interest in BLPR, Inc., from four of his heirs.” No other documentation of this alleged transfer appears in the record on appeal. Consequently, if the issue is found to be a material issue of fact, we note that the record presented on appeal does not establish, via the pleadings, depositions, answers to interrogatories, admissions on file, or affidavits, precisely what percentage of BLPR shares was inherited by Mr. Barrios’s wife and children, or whether those percentages were still owned at all relevant times.

. Mr. Redd's interest in BLPR was alleged to have later been transferred to his wife, Darlene C. Redd, who was declared to be separate in property from him, and that she then transferred her interest in BLPR to her solely-owned corporation, Redd Investments, Inc. Thereafter, in the April 17, 2003 settlement agreement, Richard E. Redd, Darlene C. Redd, and Redd Investments, Inc. ("the Redd parties”) transferred any and all interests/rights they possessed in BLPR to BLPR.

. The "division,” as stated by LSA-R.S. 27:3(7), means "the division in the office of state police, Department of Public Safety and Corrections which provides investigatory, regulatory, and enforcement service to the [Louisiana Gaming Control Board] in the implementation, administration, and enforcement of [the Louisiana Gaming Control Law].” The Video Draw Poker Devices Control Law, LSA-R.S. 27:301 et seq., also provides in LSA-R.S. 27:301(B)(6) that " ‘Division’ shall have the same meaning as that term [is] defined in R.S. 27:3.” In furtherance of the authority granted to it by LSA-R.S. 27:308, the "division,” known as the "Video Gaming Division of the Office of State Police” ("VGD/OSP”), has promulgated rules and regulations applicable to video draw poker devices in La. Admin. Code, Title 42, Part XI, § 2401 et seq., in order to "protect the video gaming industry from infiltration by organized crime and other harmful and unscrupulous elements, thereby ensuring the fair play of all video gaming devices, and the prosperity and longevity of the industry.” La. Admin. Code, Title 42, Part XI, § 2411(B).

. Louisiana Revised Statute 27:309(B) provides:
Any person who manufactures, distributes, sells, possesses, or operates a gambling device as described in R.S. 15:31, or a video draw poker device as described in this Chapter without the license required by this Chapter or at a location or on premises not authorized by the division shall, upon conviction, be imprisoned with or without hard labor for not more than ten years or be fined not more than ten thousand dollars, or both.

. A "person” is defined as including "any ... corporation.” See LSA-R.S. 27:3(22); 27:301(B)(22).

. However, we note that the Gaming Venture case dealt only with the license holder and did not address any issues related to a person entitled to a commission by virtue of a contractual agreement related to facilitation of the establishment of the video poker gaming operation; therefore, the case has limited applicability in the instant litigation. In Gaming Venture, at issue was the validity and enforceability of contracts for the installation and operation of video poker machines by the plaintiff in several of the defendant’s locations; however, the machines were never installed and one of the defenses presented in the ensuing breach of contract suit was that, with respect to one location, the contract had not been properly submitted for approval to the VGD/OSP as required by the Video Draw Poker Devices Control Law. In Gaming Venture, the plaintiff’s suit was dismissed by partial summary judgment, upon a finding by the trial court that the contracts were absolute nullities because of noncompliance with licensing regulations. On appellate review, the Fifth Circuit recognized that the law required that a location’s owners must be subjected to a suitability determination before receiving a license. No such determination had been made in that case and the result reached by the trial judge was found correct. Although the parties may have previously been licensed and passed a suitability review, the appellate court held that compliance with applicable laws was required for each new contract, citing La. Admin. Code, Title 42, Part XI, § 2411(H)(2) (requiring "[a]ll applicants and licensees shall submit copies of all written contracts pertaining to the operation of video gaming devices ... to which they are party or intend to become party within 10 business days of signing or making such contracts”) and LSA-R.S. 27:309(B) (making it a criminal offense for any person to operate a video poker machine without complying with all of the requirements for obtaining a license). Gaming Venture, 2008-310 at pp. 3-4, 996 So.2d at 516-17. The Fifth Circuit affirmed the trial court finding that since there had been incomplete compliance with the licensing procedures for the contracts at issue, the contracts had not become effective and enforcement of the contracts would be against public policy. See Gaming Venture, 2008-310 at p. 4, 996 So.2d at 517. We note that the circumstances of the instant case differ on a significant point from those presented in Gaming Venture, in that, in this case, the licensee (National Gaming) presumably has met all requisite suitability requirements, and the issues presented herein deal only with whether a non-licensee (BLPR) was also required to be declared suitable by the VGD/ OSP.

. Participants in the gaming industry that are required to be licensed include: device owners, operators, distributors, service entities, and gaming establishments. See LSA-R.S. 27:311.

. Louisiana Revised Statute 27:310(D) provides in full:
Every person who has or controls directly or indirectly more than a five percent ownership, income, or profit interest in an entity which has or applies for a license in accordance with the provisions of this Chapter, or who receives more than five percent revenue interest in the form of a commission, finder’s fee, loan repayment, or any other business expense related to the gaming operation, or who has the ability, in the opinion of the division, to exercise a significant influence over the activities of a licensee authorized or to be authorized by this Chapter, shall meet all suitability requirements and qualifications for licensees. For the purposes of this Chapter, all gaming related associations, outstanding loans, promissory notes, or other financial indebtedness of an applicant or licensee must be revealed to the division for the purposes of determining significant influence and suitability.
No facts were alleged in the instant case implicating the applicability of the provision relative to "persons who have the ability to exercise a significant influence over the activities of a licensee;” therefore, it is not at issue herein.

.National Gaming's arguments on appeal also seem to assert that certain BLPR minority shareholders were subject to LSA-R.S. 27:310(D)'s requirement that "[ejvery person who has or controls directly or indirectly more than a five percent ownership, income, or profit interest in an entity” must pass a suitability review. National Gaming contends that the suitability of these BLPR shareholders, i.e., the children of Mr. Barrios (Lisa Jordan, Roxanne Barrios, Pam Cuculla, and *787 Stacie Nola), who allegedly owned more than a five percent interest in BLPR, should have been determined and was not. However, the foregoing referenced provision of LSA-R.S. 27:310(D) is qualified by the phrase “which has or applies for a license in accordance with the provisions of this Chapter;” therefore, the provision only applies to an entity that "has or applies for a license.” As previously stated herein, BLPR did not, nor was it required to, hold or apply for a license. We find no merit in this argument by National Gaming. However, we note that only if BLPR receives more than a five percent revenue interest, so as to trigger LSA-R.S. 27:310(D)’s suitability requirement on that basis, would the requirement that "all suitability requirements and qualifications for licensees” be met, thereby also triggering the requirement that "[e]very person who has or controls directly or indirectly more than a five percent ownership, income, or profit interest in an entity” pass a suitability review. In such a case, BLPR's “more than five percent" shareholders would also be required to meet suitability requirements. Notwithstanding, as noted hereinabove, Mr. Barrios's children would only have owned either a 1.5625% or a 3.125% interest, each, in BLPR, depending on whether Mr. Barrios’s stock was community or separate property, and would not be required to meet suitability, pursuant to this LSA-R.S. 27:310(D) provision.

. We do not reach the issue of whether the "revenue interest,” discussed in LSA-R.S. 27:310(D), references "the gaming operation” of the licensee (in this case, National Gaming) as an entity, which might include other gaming locations owned or operated by the licensee, or whether "the gaming operation” is limited only to those gaming locations in which the “person” (in this case, BLPR) has a "revenue interest,” as a ruling on the issue is not necessary for the resolution of the issues presented in this appeal.

. Louisiana Administrative Code, Title 42, Part III, § 120(B) requires that "[a]ll applicants, licensees, permittees and persons required to be found suitable shall fully comply with all instructions contained in the prescribed forms and shall provide all documentation and information requested therein.”

. We note that suitability investigations are not conducted directly by the LGCB, but rather, in accordance with LSA-R.S. 27:310(B)(1), these determinations are made *788 by "the division,” which as stated herein-above, pursuant to LSA-R.S. 27:3(7), is the "division in the office of state police, Department of Public Safety and Corrections which provides investigatory, regulatory, and enforcement service to the [Louisiana Gaming Control Board] in the implementation, administration, and enforcement of [the Louisiana Gaming Control Law],” known as the Video Gaming Division of the Office of State Police ("VGD/OSP”). Thus, it is the VGD/OSP that makes the suitability determinations with respect to the Video Draw Poker Devices Control Law.

. With respect to BLPR shareholders, Gil Lerma, Guy Palermo, and Patricia Barrios, the Office of State Police did issue individual letters as to each, on December 5, 2003, reciting satisfactory results following suitability investigations. We note that if the allegations made in the instant suit are true and correct, i.e., that Richard Barrios’s children sold their interests in BLPR to Darlene Redd, and that she thereafter transferred all of her interests/rights in BLPR to BLPR, then the only remaining shareholders, at that time, would have been Gil Lerma, Guy Palermo, and Patricia Barrios.

. Louisiana Revised Statute 49:963 provides, in pertinent part, that "[t]he validity or applicability of a rule may be determined in an action for declaratory judgment in the district court of the parish in which the agency is located,” and that ”[t]he court shall declare the rule invalid or inapplicable if it finds that it violates constitutional provisions or exceeds the statutory authority of the agency or was adopted without substantial compliance with required rulemaking procedures.”

. Although it was not directly stated in the Bankruptcy Court order, the parties do not dispute that the purchaser referenced was National Gaming.