WILLIAMS, J.
|tIn this suit for damages resulting from a breach of contract, plaintiff, RJAM, Inc. (“RJAM”), appeals: (1) the trial court’s award of damages in the amount of $184,681; (2) the trial court’s determination that it is not entitled to collect damages until the Gaming Division of the Louisiana State Police Department determines that RJAM has met the suitability requirements set forth in LSA-R.S. 27:310; and (3) the court’s denial of its exception of res judicata. For the reasons that follow, we amend the award of damages to increase the amount awarded from $184,681 to $194,598.52, and as amended, affirm.
FACTS
Raymond Mahfouz was employed by Louisiana Gaming Management, Inc. (“LGM”), a company which was in the business of funding and providing video gaming devices for diverse locations. In return for his services, Mahfouz received a percentage of revenue generated by the gaming devices. On July 3, 1992, Mahfouz contracted with Golden’s Quickstop (“Golden’s”) for the placement of video poker devices. However, LGM was unable to provide financing and fulfill its part of the contract with Golden’s, due, in part, to LGM’s inability to obtain the required gaming licenses. Consequently, Mahfouz sought other investors to acquire and fund LGM’s agreement with Golden’s (“LGM Agreement”). Subsequently, Sam Mijalis became an investor, and Leon Miletello d/b/a L.S.M. Amusement Company (“LSM Amusement”) agreed to operate the business in accordance with LGM’s agreement with Golden’s. The LGM Agreement was later assigned to LSM Amusement and the necessary Lgaming licenses were acquired by Miletello.
Thereafter, several contractual transactions occurred. On October 8, 1992, LSM Amusement entered into a Location Contract with Golden’s, granting LSM Amusement a lease of the property, along with *507 the exclusive right to place and operate video poker devices at the location. The term of the Location Contract was for 84 months (seven years), beginning October 19,1992, and terminating October 18,1999; the contract was automatically renewable for 12 months if not cancelled in writing within 30 days prior to the termination date.
On October 19,1992, Mahfouz and Mijal-is (“the Associates”) entered into a Compensation Agreement with LSM Amusement. In consideration of securing the Golden’s location, LSM Amusement agreed to pay Mahfouz and Mijalis 40% of the monthly adjusted gross income, or $35,000 per month, whichever amount was greater. The contract set forth several other provisions regarding priority of payment, as well as a payment of $8,400 to LSM Amusement as the fee for operating the location.
Mahfouz and Mijalis further agreed that Mahfouz would receive 60% of the Associates’ portion of the revenue received from the Compensation Agreement, and Mijalis would receive 40%. Subsequently, Mahfouz assigned and transferred 22.5% of his interest to Edgar Mouton; Mahfouz retained ownership of 77.5% of his previously owned 60%. These agreements were reduced to writing. On November 3, 1993, Mahfouz assigned and transferred all of his remaining rights, title and interest in the Compensation Agreement to plaintiff, RJAM, a corporation owned by [sMahfouz’s wife, JoAnn Mahfouz.[1]
Golden’s opened for business in November 1992. Pursuant to the Location Contract, the location continued to be owned by Larry Golden and operated by LSM Amusement. Miletello paid the Associates (Mahfouz and Mijalis) per the Compensation Agreement. Due to modifications by the parties and the varying revenue totals, the actual amount paid differed each month. However, at no time over the course of the contract did the Associates receive $35,000 per month.
On March 3, 1998, prior to the expiration of the Location Contract, a criminal investigation commenced into the affairs of Larry Golden. To avoid having the location closed, Miletello d/b/a Logansport Gaming, LLC (“Logansport Gaming”), purchased Golden’s interest in the property and the video gaming operation. Golden also sold to Logansport Gaming the use of Golden’s as a gaming location, along with all licenses and permits required to operate the location.[2]
By correspondence dated March 13, 1998, Miletello advised Mijalis, Mahfouz and RJAM of the sale of Larry Golden’s rights and interests to Logansport Gaming. He also advised the parties that the Location Contract and the Compensation Agreement had been terminated by the sale. Miletello informed them that no further payments would be made “on and |4after March 3,1998.”
Subsequently, a Termination Agreement was entered into by and between: Logans-port Gaming, L.S.M. Gaming, Inc. (a Louisiana corporation also solely owned by Mi-letello); Golden’s Gaming Corporation (previously owned by Larry Golden and acquired by Miletello); and LSM Amuse *508 ment (owned by Miletello). Pursuant to this agreement, the LGM Agreement and the Location Contract were terminated.
On September 24, 1998, RJAM sued Mi-letello d/b/a LSM Amusement, LSM Gaming and Logansport Gaming for breach of contract. The issues of contract liability and damages were bifurcated. Following a trial on the issue of liability, the trial court found that RJAM failed to meet its burden of proving breach of contract. The court denied all of RJAM’s claims, finding that the contracts were valid when created, but were rendered “impossible for the Court to determine the true intent of the parties” due to the modifications by later agreements and “understandings” between the relevant parties.
RJAM appealed, and this court reversed, finding that the termination of the Location Contract did not result in the termination of the Compensation Agreement. This court stated:
The Location Contract and Compensation Agreement are two independent contracts with different underlying obligations owed to different parties. While the four Miletello businesses may have successfully terminated the Location Contract, there is nothing that allows LSM Amusement to unilaterally terminate the Compensation Agreement with the Associates. See La. C.C. art. 2024. In fact, the Compensation Agreement does not allow for unilateral termination for the first seven years, and only at the time of renewal is there an option to terminate the | ^contract. Simply stated, since the record clearly reflects that RJAM did not terminate the Compensation Agreement, LSM Amusement breached the contract by prematurely terminating it. As such, RJAM is entitled to payment until October 18, 1999.
RJAM, Inc. v. Miletello, 45,176 (La.App.2d Cir.4/14/10), 44 So.3d 283, 286, writ denied, 2010-1127 (La.9/17/10), 45 So.3d 1049. We remanded this matter to the trial court for a determination of the amount of damages owed to RJAM.
Following remand, defendants moved for summary judgment, arguing that neither Mahfouz nor RJAM had met suitability requirements as set forth in LSA-R.S. 27:310(D); therefore, RJAM was not entitled to damages. In response, RJAM filed a motion to strike and/or dismiss the motion for summary judgment. Thereafter, defendants withdrew the motion for summary judgment but reserved the legal arguments raised therein. RJAM then filed a peremptory exception of res judicata, arguing that the issue of suitability was a contract issue; therefore, it had been adjudicated in the first phase of the trial.
Following a trial on the issue of damages, the trial court awarded damages in the amount of $184,681. However, the court ruled that RJAM was “not entitled to collect any damages until ... [RJAM] is determined by the Gaming Division of the Louisiana State Police to have been suitable to be awarded damages under the contract for the time period awarded of March 1998 to October 1999.” The court stayed the enforceability of the award of damages, pending the suitability determination. In its reasons for judgment, the trial court stated:
| |JL]SM Amusement entered into the Compensation Agreement contract with Mahfouz and Mijalis whereby they were to receive 40% of LSM Amusement’s share in the proceeds. As partakers in LSM Amusement’s income or profit interest, Mahfouz and Mijalis were required to meet all suitability requirements and qualifications for licensees under La. R.S. 33:4862.10(D). As such, they were also required to submit the Compensation Agreement within 10 days of its signing or making.
*509 Similarly, RJAM was required to meet all suitability requirements for licensees when it acquired Mahfouz’s rights, title, and interest to the Compensation Agreement through the November 1, 1993 assignment. Sec. 2411(F)(8) of the Administrative Code also clearly requires an applicant for licensing to submit any contracts to which it intends to become a party within 10 days of signing or making such contract. Although not an original party, RJAM intended and did become a party to the Compensation Agreement. Despite these mandatory conditions, RJAM failed to present any evidence that the contract was ever submitted and a suitability determination made.
[[Image here]]
RJAM appeals.
DISCUSSION

Damages

RJAM contends the trial court erred in awarding damages in the amount of $184,681. RJAM argues that the Compensation Agreement provided that the Associates were to receive either 40% of the adjusted gross income, or $35,000 per month, whichever amount was greater. Therefore, according to RJAM, it is entitled to receive a minimum of $16,275 per month, from November 1992 through October 19, 1999, which constitutes 77.5% of 60% of $35,000. RJAM also argues that the Compensation Agreement provided that the Associates would receive any 17revenue that was left over after all expenses were paid. Whenever an expense was no longer incurred, the Associates, RJAM and Mijalis, were to receive the net profit. Consequently, when Miletello terminated the agent’s agreement and settled with Mijalis and Mouton, those expenses were no longer Miletello’s obligations. Thus, RJAM is entitled to benefit from those profits.
In a suit for breach of contract, ordinary damages are intended to put the plaintiff in the same economic position as it would have been had the contract been fulfilled as planned. Thus, the objective of an ordinary (compensatory) damage award is to repair the damage caused by the party that breached the contract. See Bienvenu v. Dudley, 95-0547 (La.App. 1st Cir.10/3/96), 682 So.2d 281, writs denied, 96-2661 (La.12/13/96), 692 So.2d 1069 and 96-2673 (La.12/13/96), 692 So.2d 1070. The standard of review for a damage award for breach of contract is whether the trial court abused its discretion. Regions Bank v. Ark-La-Tex Water Gardens, L.L.C., 43,604 (La.App.2d Cir.11/5/08), 997 So.2d 734, writ denied, 2009-0016 (La.3/13/09), 5 So.3d 119; Mount Mariah Baptist Church, Inc. v. Pannell's Assoc. Electric, Inc., 36,361 (La.App.2d Cir.12/20/02), 835 So.2d 880, writ denied, 2003-0555 (La.5/2/03), 842 So.2d 1101.
In the instant case, the original Compensation Agreement by and between LSM Amusement and the Associates (Mi-jalis and Mahfouz) was entered into on October 19, 1992. The Agreement provided as follows:
* * *
3.
[F]or and in consideration for the Associates assisting in |8obtaining said location, LSM hereby binds and obligates itself to pay as compensation to Associates forty percent (40%) of the adjusted gross income earned monthly by said devices or $35,000.00 monthly whichever is the greater amount.
In the event that the monthly adjusted gross revenue received by LSM does not equal the minimum compensation of *510 $85,000.00 due then, the deficiency shall be carried forward until such time as the revenue earned shall be adequate to make up said deficiency.
It being LSM and the Associates’ intent that Associates receive 40% of the adjusted gross income the devices earn for LSM or $420,000.00 per year amortized monthly whichever'is greater throughout the entire term of the contract between the location and LSM and any renewal thereof.
4.
Adjusted gross income, for the purpose of this agreement, is defined as that amount of revenue earned by LSM after deducting the following from the gross revenue generated by the operation of the video poker devices LESS:
Any cash or prizes paid to the players as shown on the meter; any franchise fees and taxes paid to the State of Louisiana or local government; the debt service payments on devices; a $50,000.00 owed annual fee (amortized in equal monthly deductions); a 7 ½% fee paid to other associates on the gross revenue LSM earns after state fees; monthly interest due on a $225,000.00 obligation owed by LSM; security expense.
The sum of $8,400.00 monthly allowed against $100,000.00 annual incidental expense and expenses directly connected with the operation and maintenance of the devices for which LSM is responsible.
All of the above defined expenses to be itemized by LSM monthly and submitted to Associates with Associates monthly payment of 40% of the adjusted gross income or $35,000 whichever is greater as set out herein. Adjustments may be made by mutual consent of |9Parties.[3]
[[Image here]]
On that same date, Mahfouz and Mijalis entered into an agreement, whereby “all proceeds received by the associates from the [Compensation Agreement]” would “be divided as follows: Raymond Mahfouz 60%[;] Sam A. Mijalis 40%.” Thereafter, on November 30, 1992, Mahfouz entered into an “Agreement and Assignment” with Mouton. That agreement provided as follows:
[[Image here]]
[F]or good and valuable consideration given, and to be given each to the other, Raymond Mahfouz does hereby convey, set over, assign and transfer unto Edgar G. Mouton, Jr., Twenty-two and one-half percent (22 ½%) interest in and to said Compensation Agreement, which thereby entitles Edgar G. Mouton, Jr. to receive 22 %% of all revenues that Raymond Mahfouz receives under the terms and conditions of the Compensation Agreement.
[[Image here]]
On November 1, 1993, Mahfouz assigned and transferred all of his interest in the Compensation Agreement to RJAM.
The agreements between the parties were altered on multiple occasions, both verbally and in writing. On May 18, 1995, RJAM and Republic Corporate Services, Inc. (“RCS”), a company owned by Mijalis, entered into an agreement by which RJAM and RCS would each receive a | inmonthly consulting fee in the amount of *511 $8,000, “in addition to the agreement presently in effect.” The consulting fee agreement was terminated on November 17, 1997.
During the trial on the issue of damages, Leon Miletello testified concerning the multiple agreements between the parties. He acknowledged these various written agreements between the parties; however, he admitted to various verbal agreements which were never reduced to writing. For example, pursuant to the Compensation Agreement, the Associates were to receive “[40%] of the adjusted gross income earned monthly by [the video poker] devices or $85,000 monthly whichever is the greater amount.” However, the Associates were never paid $85,000 per month; they were only paid 40% of the adjusted gross income throughout the term of the contract. When questioned about the $35,000 per month provision in the contract, Miletello stated:
We’ve all tried to figure out what the thirty-five thousand meant. And to this day, we don’t know for sure. And it was never an issue when they get all of the accounting.
[[Image here]]
[I] don’t know why the thirty-five thousand was even put in there. It was never an issue with us.
[[Image here]]
[I]t’s in the contract that way. I mean I recall it but it was never an issue. It was nothing that LSM was supposed to pay. It was all part of the poker machines. It was nothing that I was obligated to pay.
[[Image here]]
[T]he thirty-five thousand was never a part of it.
⅜ ⅜ ⅜
Miletello also testified that over the course of the contractual relationship, he paid the agreed upon expenses and provided the Associates with the h,necessary financial information; the Associates then divided the net profits among themselves.
After reviewing the record in its entirety, we conclude that the trial court did not abuse its discretion in failing to award damages in the amount of $16,275 per month, from November 1992 through October 19, 1999. The Compensation Agreement provided, “Adjustments may be made by mutual consent of the parties.” Our review of the record reveals that the parties adjusted the agreement seemingly at will. We note that despite the express language of the Compensation Agreement, none of the Associates ever received $35,000 per month. After all of the expenses were paid, the amount of revenue to be distributed among the Associates did not amount to $35,000. Thus, based upon the unrefuted testimony of Miletello, the Associates divided the net revenue among themselves, giving no credence to the $35,000 per month as provided in the Compensation Agreement. We find no merit in RJAM’s argument that it is entitled to 77.5% of 60% of $35,000 per month.
RJAM also contends the trial court erred in deducting the video poker machine payments in the amount of $12,000 per month from the calculation of damages. RJAM argues that the note for the machines was paid in full by the end of 1995, and the parties did not intend for the payments to be used to calculate the adjusted gross income after the note was paid in full.
Pursuant to the Compensation Agreement, “debt service payments on devices” were to be deducted from the net profits. The record reveals that after the note for the original video poker machines was paid in full, the 112Associates (Mijalis and Mah *512 fouz) agreed to pay themselves a consulting fee in the amount of $8,000 per month each. The consulting fee ended in 1997, and soon thereafter, Miletello purchased 42 new video poker machines. Miletello testified that the new machines were necessary to the establishment, stating:
[The initial machines] were old. They were old machines. Games have changed. Games change. These were upgrading and a lot of them, we’d had a lot of problems with the machines.
We find no merit to RJAM’s argument that the payments for new video poker machines were not allowable under the Compensation Agreement. As stated above, the Agreement provided that “debt service payments on devices” would be deducted from the net proceeds. There is no provision in the Agreement which stated that the machine payments were only allowable for the machines that existed when the parties entered into the agreement. The gaming devices were an essential element of operating a gaming establishment, and as Miletello testified, the original machines were old and needed to be upgraded. This assignment lacks merit.
RJAM also contends the trial court erred in deducting the cost of seafood plates from the net revenue. RJAM argues that the parties never intended for this expense to be included in determining the adjusted gross income.
During the trial, Miletello was questioned about the deduction of the seafood plates. He testified as follows:
That was part of the advertising. And what they did is not only the seafood plates, they had rented a bus and then they would send that bus to Texas to pick up some | ^players. And sometimes it would be ten, sometimes it would be fifteen or twenty. Bring them in for lunch, buy their lunch, and keep them there until like 4:30 and then take them back. And then at night they had a seafood buffet. And they were selling the seafood buffet at that time for like $7.99. So they compensated the restaurant so much a plate for that in order to bring the players in. And it was a promotion that was part of the advertising for the game room. We still do that today.
The record contains a letter, dated November 10, 1995, in which the parties agreed to add the cost of “advertising” to their Agreement. RJAM did not introduce any evidence to refute Miletello’s testimony that the seafood plates were a part of the advertising. Therefore, we find no error in the trial court’s decision to deduct the cost of seafood plates from the parties’ net revenue.
RJAM also contends the trial court erred in deducting the cost of insurance premiums from the adjusted gross income. RJAM argues that the cost of insurance premiums was not a part of the Compensation Agreement, and the parties never intended to allow for that expenditure.
The record contains only scarce evidence with regard to the payment of insurance premiums. Miletello was asked whether he paid insurance premiums after 1998, and he responded, “Yes sir, I paid that.”
We note that none of the agreements between the parties mentioned insurance premiums as an expense to be deducted from the net profits distributed among the Associates. Our review of the financial documents introduced into evidence shows that insurance premiums were not deducted as an expense until LSM Gaming purchased the truck stop. It was not until March 1998 that the spreadsheets began showing a cost of insurance | ^premiums in the amount of $1,066.40 per month.
*513 Based upon the evidence presented, we find that the trial court erred in subtracting $9,917.52 from the amount due to RJAM to cover the cost of insurance premiums. Accordingly, we amend the trial court’s damages award and award to RJAM damages in the amount of $194,598.52.
Additionally, RJAM contends that it is entitled to receive additional damages under the Compensation Agreement. According to RJAM, the parties agreed that the Associates would receive any revenue that was remaining after all expenses were paid. For example, whenever an expense was no longer incurred, the Associates would benefit from the increase in profit. Consequently, after Miletello terminated the agents’ agreement, the 7.5% payable to the agents was no longer deducted from the net profits; therefore, RJAM is entitled to increased damages from this particular termination. Additionally, Miletello reached a settlement with Mijalis and Mouton. After that settlement, RJAM became entitled to receive the entirety of the Associates’ share of the net profits.
Our review of this record also reveals that LSM Amusement settled the claims filed by Mijalis and Mouton shortly after it unilaterally terminated the Compensation Agreement. Pursuant to those settlements, the rights of the parties who settled were transferred to LSM Amusement/Mi-letello. Nothing in this record supports RJAM’s argument that it is entitled to an increase in the amount of damages as a result of the settlement between Miletello and the agents and/or Miletello and the other Associates.
11SAdditionally, as stated above, “the objective of an ordinary (compensatory) damage award is to repair the damage caused by the party that breached the contract.” At no time during the period when the contract was in effect did RJAM receive all of the net profits due to the Associates. RJAM is not entitled to do so now.

Suitability

RJAM contends the trial court erred in concluding that RJAM is stayed from receiving damages, pending a determination of suitability. It argues that the issue of suitability is an affirmative defense, which was not pled by defendants prior to filing the motion for summary judgment after remand. RJAM also argues that the court erred in requiring RJAM to prove suitability, rather than requiring defendants to prove RJAM was not suitable.
LSA-R.S. 27:S10(D) provides:
Every person who has or controls directly or indirectly more than a five percent ownership, income, or profit interest in an entity which has or applies for a license in accordance with the provisions of this Chapter, or who receives more than five percent revenue interest in the form of a commission, finder’s fee, loan repayment, or any other business expense related to the gaming operation, or who has the ability, in the opinion of the division, to exercise a significant influence over the activities of a licensee authorized or to be authorized by this Chapter, shall meet all suitability requirements and qualifications for licensees. For the purposes of this Chapter, all gaming related associations, outstanding loans, promissory notes, or other financial indebtedness of an applicant or licensee must be revealed to the division for the purposes of determining significant influence and suitability.
LSA-R.S. 27:28(A) provides, in pertinent part:
l1fi[F]or the purposes of this Title, ‘suitable’ means the applicant, licensee, casino gaming operator, permittee, or other person is:
*514 (1) A person of good character, honesty, and integrity.
(2) A person whose prior activities, criminal record, if any, reputation, habits, and associations do not pose a threat to the public interest of this state or to the effective regulation and control of gaming, or create or enhance the dangers of unsuitable, unfair, or illegal practices, methods, and activities in the conduct of gaming or carrying on of the business and financial arrangements incidental thereto.
(3) Capable of and likely to conduct the activities for which the applicant, licensee, permittee, casino gaming operator, or licensed eligible facility is licensed, permitted, or approved pursuant to the provisions of this Title.
(4) Not disqualified pursuant to the provisions of Subsection B of this Section.[4]
117Simply stated, Louisiana law requires that “[e]very person ... who receives more than five percent revenue interest in the form of a commission, finder’s fee, loan repayment, or any other business expense related to the gaming operation ... shall meet all suitability requirements and qualifications for licensees.” LSA-R.S. 27:310(D); See also BLPR, Inc. v. National Gaming, Inc., 2010-1221 (La.App.1st Cir.4/6/11), 64 So.3d 779.
In the instant case, Mahfouz and Mijalis entered into a Compensation Agreement with LSM Amusement. Subsequently, Mahfouz and Mijalis agreed that Mahfouz would receive 60% of the revenue received, and Mijalis would receive 40%. After transferring 22.5% of his interest in the Compensation Agreement to another party, Mahfouz assigned and transferred his remaining rights to RJAM. Thus, Mahfouz, and later, RJAM, clearly “ha[d] or controlled] directly or indirectly more than five percent ownership, income, or profit interest in an entity which ha[d] applie[d] for a [gaming] license[.]” Accordingly, Mahfouz and RJAM had |isan obligation to demonstrate “suitability” for licensing, as required by LSA-R.S. 27:310(D). This record does not contain any evidence that either Mahfouz or RJAM ever demonstrated that he/it was *515 suitable, as required by the statute.[5] Accordingly, we find no error in the trial court’s determination that RJAM is not entitled to collect damages until a suitability determination is made. This assignment lacks merit.
RJAM also argues that the trial court erred in failing to find that defendants are prohibited from raising the suitability issue, as they did not raise the issue as an affirmative defense. According to RJAM, it should not be required to prove suitability; rather, defendants are required to prove that it is not suitable.
As stated above, LSA-R.S. 27:28(A) provides that “no person shall be eligible to obtain a license or permit, enter into a casino operating contract with the state, or obtain any other approval ... unless the applicant has demonstrated by clear and convincing evidence that ... that he is suitable(Emphasis added). Pursuant to LSA-R.S. 27:310, the suitability requirement extends to “every person who has or controls directly or indirectly more than a five percent ownership, income, or profit interest in an entity which has or applies for a license ... or who receives more than five percent revenue interest [in the entity].”
It is undisputed that RJAM received more than five percent of the revenue derived from this venture. Thus, pursuant to the plain language of 119LSA-R.S. 27:28 and 27:310, RJAM was required to demonstrate its suitability, by clear and convincing evidence, prior to entering into the agreement with Mahfouz and/or LSM Amusement. RJAM has never done so. Nothing in the statute indicates that defendants were required to prove that RJAM is not suitable. This assignment lacks merit.
In the alternative, RJAM contends the trial court erred in interpreting the requirements of suitability. RJAM argues that the parties entered into the Compensation Agreement in 1992; LSA-R.S. 27:310 was not enacted until 1996 and is not expressly retroactive.
At the time the parties entered into the Compensation Agreement, LSA-R.S. 33:4862.10(D) provided:
Every person who has or controls more than a five percent ownership, income, or profit interest in an entity which has or applies for a license in accordance with the provisions of this Part, or who has the ability, in the opinion of the division, to exercise a significant influence over the activities of a licensee authorized or to be authorized by this Part, shall meet all suitability requirements and qualifications for licensees.
Pursuant to § 3 of Acts 1996, 1st Ex.Sess., No. 7, LSA-R.S. 33:4862.10 was redesig-nated as LSA-R.S. 27:310.
As stated above, RJAM had more than a five percent profit interest in the video poker venture. RJAM has not met the suitability requirement, as set forth in either LSA-R.S. 27:310 or the former LSA-R.S. 33:4862.10. Therefore, we find that the trial court did not err in concluding that RJAM is prohibited from receiving gaming revenues until the suitability requirement is met. This assignment lacks merit.
| wRes Judicata
RJAM contends the trial court erred in denying its exception of res judicata. It argues that the issue of suitability arises *516 out of the validity of the Compensation Agreement, which goes to the issue of contract liability. The liability issue was addressed by this court’s prior ruling and became final when the Supreme Court denied defendants’ writ application.
The doctrine of res judicata precludes subsequent litigation when: (1) there is a valid judgment; (2) the judgment is final; (3) the parties in the two matters are the same; (4) the cause or causes of action asserted in the second suit existed at the time of the final judgment in the first litigation; and (5) the cause of action asserted in the second suit arose out of the transaction or occurrence that was the subject matter of the first litigation. LSA-R.S. 13:4231; Burguieres v. Pollingue, 2002-1385 (La.2/25/03), 843 So.2d 1049.
In the instant case, after considering the arguments of both parties regarding the exception of res judicata, the trial court denied plaintiffs exception. The court stated, “[T]he Court of Appeal has not addressed this particular issue on this particular case[.]”
We agree. As stated above, the issues of contract liability and damages were bifurcated. The prior litigation, as well as this court’s prior ruling, addressed only the issue of whether the termination of the Location Agreement resulted in the termination of the Compensation Agreement. Neither the issue of suitability nor the issue of damages was addressed by the trial court and this court. We remanded the matter to the trial court for a determination of the amount of damages owed to RJAM. Therefore, the trial court did not err in denying RJAM’S |⅞1 exception of res judicata. This argument lacks merit.

Law of the Case Doctrine

Next, RJAM contends the law of the case doctrine prohibits defendants from raising the issue of suitability. According to RJAM, this court has already concluded that defendants are liable to RJAM under the valid contracts at issue. The only remaining issue for the trial court to decide was the issue of damages, and the issue of suitability was not properly before the court.
Under the “law of the case” doctrine, courts of appeal generally refuse to reconsider their own rulings of law on a subsequent appeal in the same case. Pitre v. Louisiana Tech University, 95-1466 (La.5/10/96), 673 So.2d 585. An appellate court will not reverse its pretrial determinations unless the defendant presents new evidence tending to show that the decision was patently erroneous and produced an unjust result. State v. Gillet, 99-2474 (La.App.4th Cir.5/10/00), 763 So.2d 725. The “law of the case” doctrine applies to all prior rulings or decisions of an appellate court or the Supreme Court in the same case, not merely those arising from the full appeal process. State v. Molineux, 2011-0275 (La.App.4th Cir.10/19/11), 76 So.3d 617.
The issues set forth in the instant case do not pertain to this court’s prior decision in this matter. As noted above, in this bifurcated matter, this court previously considered the issue of contractual liability. Suitability and damages were not considered in this court’s prior opinion. This argument lacks merit.
CONCLUSION
For the foregoing reasons, we amend and increase the judgment awarding damages to RJAM against Leon Miletello d/b/a L.S.M. Amusement Co., L.S.M. | ^Gaming, Inc. and Logansport Gaming, L.L.C. to $194,598.52. In all other respects, the judgment is affirmed. Each party shall bear its own costs.
*517 JUDGMENT AMENDED; AFFIRMED AS AMENDED.

. JoAnn Mahfouz testified that she had no involvement with any of RJAM's activities. She stated that she "did nothing," while her husband conducted all of the company’s business.

. Additionally, Golden sold the following items to Logansport Gaming: two parcels of land; the real property upon which Golden’s is located, together with all improvements; all furniture, fixtures and equipment at Golden’s; and, all of the outstanding stock of Golden's Gaming Corporation, Inc.

. In a separate agreement, the parties agreed that the priority of payments would be as follows:
(a) security expense;
(b) interest on the DESPOT loan;
(c) the machines;
(d) LSM management fee [$8,400] per month;
(e) DESPOT yearly payment to be paid on a per-month basis;
(f) agent’s commissions of [7.5%] of LSM's net profit.

. LSA-R.S. 27:28(B) provides:
The board or division, where applicable, shall not grant a license or permit, enter into a casino operating contract, or issue any other approval pursuant to the provisions of this Title to any person who is disqualified on the basis of the following criteria:
(1)The conviction or a plea of guilty or nolo contendere by the applicant or any person required to be suitable under the provisions of this Title for any of the following:
(a) Any offense punishable by imprisonment of more than one year.
(b) Theft or attempted theft, illegal possession of stolen things, or any offense or attempt involving the misappropriation of property or funds.
(c) Any offense involving fraud or attempted fraud, false statements or declarations.
(d) Gambling as defined by the laws or ordinances of any municipality, any parish or county, any state, or of the United States.
(e) A crime of violence as defined in R.S. 14:2(B).
(2) There is a current prosecution or pending charge against the person in any jurisdiction for any offense listed in Paragraph (1) of this Subsection.
(3) The person is not current in filing all applicable tax returns and in the payment of all taxes, penalties, and interest owed to the state of Louisiana or any political subdivision of Louisiana, excluding items under formal appeal.
(4) The failure to provide information and documentation to reveal any fact material to a suitability determination, or the supplying of information which is untrue or misleading as to a material fact pertaining to the suitability criteria.

. By letter dated March 1, 1996, the Department of Public Safety and Corrections notified Leon Miletello that "individuals receiving money from the video gaming operations at Golden’s Quick Stop have not met suitability requirements, as required by the Division.” Mahfouz was listed as one of the individuals who had not met suitability requirements.